FILED

2016 Mar-28  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EUGENE MILTON CLEMONS, II,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **2:10-cv-02218-LSC** |
| | ) | |
| | ) | |
| **KIM T. THOMAS,** | ) | |
| **Commissioner, et al.** | ) | |
| | ) | |
| **Respondents.** | ) | |

### MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Eugene Milton Clemons, II ("Clemons"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. The only claim that remains pending before this Court is Clemons's claim that he is intellectually disabled and, therefore, ineligible for the death penalty, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution. *See Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2422, 2252 (2002) (holding that under the Eighth Amendment "death is not a suitable punishment for a mentally retarded criminal") (hereinafter, Clemons's "*Atkins* claim"). After conducting a four-day evidentiary hearing, an Alabama circuit court denied Clemons's *Atkins* claim on the merits, and the

Alabama appellate courts affirmed. This Court's review is thus circumscribed by the parameters of 28 U.S.C. § 2254(d) (providing that a federal court may only grant relief if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). Upon thorough consideration of the entire record, the Court finds that Clemons's petition for habeas relief is due to be denied.

## I.    FACTS OF THE CRIME

In its opinion on direct appeal affirming Clemons's conviction and death sentence, the Alabama Court of Criminal Appeals (hereinafter, the "ACCA"), stated the facts of the crime as follows:

> The state's evidence tended to show that on May 28, 1992, Douglas Althouse, a special agent with the Drug Enforcement Administration (D.E.A.), was shot and killed while [Clemons] and his codefendant stole the automobile in which he was a passenger. Dr. Joseph Embry, state medical examiner, testified that Althouse was shot twice and that the fatal bullet entered the left side of his chest and passed through his heart.

> Naylor Braswell of the Jefferson County Sheriff's Department testified that the victim and he were sharing an apartment at the time of the murder. Braswell testified that on May 28 at approximately 10:00 p.m., he and Althouse left the apartment in Braswell's black

Camaro automobile, to meet a narcotics officer. Braswell pulled into a service station/convenience store to borrow the telephone book to make a call on his cellular telephone. While he was in the store he noticed that a stocky black male had gotten into his car and was sitting behind the steering wheel, armed with a revolver. At trial, Braswell testified that [Clemons] looked like the man he saw in his car. He heard two muffled shots, saw Althouse dive out of the car, and saw Althouse shooting at the car. He ran out to Althouse as he collapsed from his injuries. Braswell testified that a bulletproof vest and a shotgun were in the trunk of the car when it was stolen.

Kenny Reed testified that he was at Herman Shannon's house on May 28 when Dedrick Smith stopped by and asked Reed to pick up [Clemons] to go get "a car." He testified that they picked up [Clemons] and drove to an area near a service station where [Clemons] got out of the car. Reed stated that he heard several shots, that there was a break in the shooting, followed by several more shots. [Clemons] then drove off in a black Camaro automobile and later went to Shannon's house. When Reed arrived at Shannon's house, [Clemons] said that no one better "open their mouths" because he had just killed a D.E.A. man. He further testified that the week before the murder, [Clemons] had told him that his car needed a new motor.

Early the next morning following the murder, the stolen Camaro was discovered near Shannon's house. The shotgun in the trunk of the car was recovered on the side of the road near [Clemons's] house.

Clemons was arrested by Federal Bureau of Investigation (F.B.I.) agents in Cleveland, Ohio. Michael Clemons, [Clemons's] uncle, who lived in Cleveland, testified that [Clemons's] sister telephoned him and told him that [Clemons] would be coming to his house. Michael Clemons testified that he met with [Clemons's] father and they subsequently met and talked with [Clemons]. Michael Clemons further stated that [Clemons] said that he had to shoot a police officer because the officer was trying to kill him and that he had to steal the car to get away.

*Clemons v. State*, 720 So. 2d 961, 965-66 (Ala. Crim. App. 1996).

## II.    PROCEDURAL HISTORY

Clemons was first tried and convicted in federal court of murdering a federal agent who was engaged in the performance of his duties, in violation of 18 U.S.C. §§ 1111 and 1114, and of carrying and using a firearm in the commission of a crime of violence, in violation of 18 U.S.C. § 924(c). *See generally United States v. Clemons*, 32 F.3d 1504 (11th Cir. 1994). Clemons was then indicted by the Shelby County, Alabama Grand Jury on two counts of capital murder. Count One of the indictment charged Clemons with the capital offense of murdering George Douglas Althouse, a special agent of the Drug Enforcement Agency ("DEA"), while he was on duty, in violation of section 13A-5-40(a)(5) of the Code of Alabama. Count Two of the indictment charged Clemons with the capital offense of murdering DEA Special Agent Althouse during a robbery in the first degree, in violation of section 13A-5-40(a)(2) of the Code of Alabama. Clemons pled not guilty and not guilty by reason of mental disease and defect to all charges. Before Clemons's trial began, the Shelby County Circuit Court, on motion of the State, dismissed Count One of the indictment. The Honorable D. Al Crowson presided over Clemons's trial.

On September 25, 1994, a jury found Clemons guilty of the capital murder of DEA Special Agent Althouse. That same day, the jurors recommended by a vote of

twelve to zero that Clemons be sentenced to death. On October 11, 1994, the court followed the jury's recommendation and sentenced Clemons to death.

On direct appeal, the ACCA and the Alabama Supreme Court affirmed Clemons's conviction and death sentence. *Clemons v. State*, 720 So. 2d 961 (Ala. Crim. App. 1996), aff'd, *Ex parte Clemons*, 720 So. 2d 985 (Ala. 1998). The United States Supreme Court denied Clemons's petition for writ of certiorari. *Clemons v. Alabama*, 525 U.S. 1124, 119 S. Ct. 907 (1999) (mem.).

Clemons, through counsel, submitted a petition for post-conviction relief, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, to the state circuit court on December 27, 1999, but he did not submit a filing fee or a request to proceed *in forma pauperis* with his petition. *Clemons v. State*, 55 So. 3d 314, 333 (Ala. Crim. App. 2003). On January 28, 2000, Clemons, again through counsel, filed a Rule 32 petition along with a request to proceed *in forma pauperis* in the circuit court, and the state courts found that he properly filed his post-conviction petition on that date. *See id.* After allowing Clemons to twice amend his Rule 32 petition on or about October 17, 2000, and January 31, 2000, the court dismissed some of the claims. The court then held an evidentiary hearing on other claims (hereinafter

"the first Rule 32 hearing") [R2. 119-730, 6157-6590],[1] but dismissed those thereafter. [C.R2 1104-1156.] Clemons appealed.

While Clemons's appeal of the denial of his Rule 32 petition to the ACCA was pending, the United States Supreme Court released its decision in *Atkins*. In his Rule 32 petitions, Clemons had argued that his trial attorneys rendered ineffective assistance because they did not develop and present any mitigating evidence concerning his limited mental capacity. In his brief to the ACCA, he reasserted his ineffective-assistance-of-counsel claims. In addition, he argued for the first time that he is intellectually disabled and that, in light of *Atkins*, his sentence of death was unauthorized as a matter of law. On appeal, the ACCA found that *Atkins* applied retroactively to cases on collateral review, and remanded Clemons's case to the circuit court with instructions to conduct an evidentiary

---

[1]     Respondents manually filed the indexed state court record consisting of 25 volumes. (Doc. 42.) Respondents cited to the record in the following manner: the clerk's record on direct appeal and the reporter's transcript on direct appeal appeared, respectively, as "C.R.___." and "R.___."; references to the clerk's record on Rule 32 appeal and the transcript of the first Rule 32 evidentiary hearing appeared, respectively, as "C.R2.___." and "R2.___."; references to the clerk's record on appeal of the Rule 32 remand proceedings appeared as "C.R3.___."; and references to the clerk's record on appeal of the denial of Clemons's successive Rule 32 petition appeared as "C.R4.___." Clemons Bates-stamped the record submitted by Respondents and re-filed those documents, consisting of volumes 1-25, corresponding to Bates-stamped numbered pages 00001 to 04502. (Doc. 56.) Clemons also supplemented Respondents' submission to include additional items from the state court record that Respondents had not included, consisting of volumes 26-44, corresponding to Bates-stamped numbered pages 04503 to 08340. (*See id.*) Clemons cited to the record as "R" with the corresponding page number. Most citations to the state court record in this opinion will conform to either Respondents' or Clemons's citation formats. Any citations not so labeled will indicate the PDF volume number and corresponding page number.

hearing on Clemons's *Atkins* claim and his claim that his attorneys rendered ineffective assistance by not developing and presenting evidence concerning his limited mental capacity. *Clemons*, 55 So. 3d at 322. Pursuant to the ACCA's remand directive, the state circuit court held a four-day evidentiary hearing on those claims on June 15-18, 2004 (hereinafter "the *Atkins* evidentiary hearing").

At the hearing, the court heard from Dr. Charles Golden, a neuropsychologist, and Dr. Joseph Wu, a psychiatrist, each retained by Clemons, and from Dr. Glen King, a clinical psychologist, and Dr. Helen Mayberg, a neurologist, each retained by the State. At the conclusion of the hearing the circuit court indicated that it was inclined to find that Clemons was not intellectually disabled, but it ordered and received post-hearing briefs and proposed orders from both Clemons and the State. The circuit court issued an order denying relief on Clemons's claims on October 28, 2004. [C.R3 1-90.] The order issued by the circuit court adopted nearly verbatim the 90-page proposed order the State had submitted.

The ACCA, on return from remand, affirmed the circuit court's denial of relief on Clemons's second amended Rule 32 petition, *Clemons*, 55 So. 3d at 348, and later overruled Clemons's application for rehearing. However, the Alabama Supreme Court granted Clemons's certiorari petition and remanded his case to the

ACCA with instructions to address the merits of his ineffective assistance of counsel claims, which it opined that the lower court erroneously found were procedurally barred from review. *Ex parte Clemons*, 55 So. 3d 348, 356 (Ala. 2007). In an unpublished memorandum, the ACCA addressed those claims and affirmed the circuit court's denial of Clemons's second amended Rule 32 petition. *Clemons v. State*, CR-01-1355, slip op. (Ala. Crim. App. Nov. 2, 2007). After that court overruled his application for rehearing, Clemons again petitioned the Alabama Supreme Court for certiorari review. That time, Alabama's highest court denied his petition for writ of certiorari.

On August 16, 2010, Clemons, through counsel, simultaneously filed a successive Rule 32 petition in Alabama circuit court and a petition for writ of habeas corpus in this Court. (Doc. 1.) Clemons then moved this Court to stay and hold in abeyance his federal habeas petition so that he could return to state court to litigate his successive petition. (Doc. 7.) On November 19, 2010, Magistrate Judge Robert R. Armstrong granted Clemons's motion to stay and hold in abeyance his habeas petition and ordered the parties to file joint status reports at sixty-day intervals. The Alabama circuit court summarily denied Clemons's successive Rule 32 petition on January 18, 2011. [C.R4 95-97.] The ACCA affirmed the circuit court's judgment. *Clemons v. State*, 123 So. 3d 1 (Ala. Crim. App. 2012). The

Alabama Supreme Court denied Clemons's petition for writ of certiorari on March 22, 2013. The United States Supreme Court denied his cert petition on October 7, 2013. *Clemons v. Alabama*, 134 S. Ct. 196 (2013) (mem.).

Respondents subsequently moved this Court to enter an order dismissing all of the claims in Clemons's petition for writ of habeas corpus, with the exception of his *Atkins* claim, because they were time-barred. (Doc. 25.) On March 17, 2015, United States District Judge Sharon L. Blackburn issued a Memorandum Opinion in which she held that all of the claims in Clemons's habeas petition were time-barred, with the exception of his *Atkins* claim. (Doc. 33.) On that same day, the Court entered an Order denying all of the claims in his petition, again with the exception of his *Atkins* claim, on the ground that they were time-barred. (Doc. 34.) The Court denied Clemons's Motion for Reconsideration. (Doc. 40.) This action was reassigned to the undersigned district judge on October 16, 2015. (Doc. 48.)

The only claim that remains pending is the *Atkins* claim, which Clemons had presented as Claim I of his federal habeas petition. Respondents filed an answer and brief regarding that claim (docs. 44 & 45), and Clemons filed his reply brief and a motion for an evidentiary hearing (docs. 53 & 54). The Court then ordered and received supplemental briefing on various issues. (Docs. 58 –61.) Accordingly, what remains of this federal habeas petition is ripe for adjudication.

## III.   STANDARDS OF AEDPA REVIEW

Because Clemons's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the provisions of 28 U.S.C. § 2254 apply to this claim. The "AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). The AEDPA thus "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.* at 16. Indeed, the purpose of AEDPA's amendments to § 2254 "is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011) (quotation marks omitted). Accordingly, federal review of final state court decisions under § 2254 is "greatly circumscribed" and "highly deferential." *Hill v. Humphrey*, 662 F.3d 1335, 1343 (11th Cir. 2011) (en banc) (quotation marks omitted). Indeed, the fact that the AEDPA mandates highly deferential review of state court decisions cannot be overstated, as explained by the Eleventh Circuit:

> In *Harrington v. Richter*, ––– U.S. ––––, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011), for example, the Supreme Court stated: As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state

court's decision conflicts with this Court's precedents. It goes no farther. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Id.* at 786–87 (citations omitted) (internal quotation marks omitted).

*Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739, 744 (11th Cir. 2011).

Thus, as a general rule, a § 2254 state petitioner may not obtain federal habeas relief "with respect to any claim that was adjudicated on the merits" by a state court. 28 U.S.C. § 2254(d). However, a petitioner may avoid that general rule if one of two conditions exist: either (1) that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1); or (2) that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). These conditions are set forth in the disjunctive, leaving federal courts alternatives for the exercise of their power to remedy constitutionally infirm state court judgments. *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (granting relief after finding petitioner satisfied (d)(2) without mentioning (d)(1)). The petitioner carries the burden of proof under

§ 2254(d)(1) & (2). *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 131 S. Ct. 1388, 1398 (2011).

The Court's § 2254(d)(1) analysis is based on the state court record. *Id.* at 181-82, 131 S. Ct. at 1398-99. Pursuant to § 2254(d)(1), the phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) (quotation marks omitted). However, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) must be given "independent meaning." *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 1518 (2000).

A state court determination is "contrary to" Supreme Court precedent, and merits habeas relief, in at least two circumstances:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id.* A state court decision is "contrary to" Supreme Court precedent if it is "substantially different from the relevant precedent of [the Supreme[ Court," for example, holding a petitioner to a state law pleading or evidentiary standard that

exceeds the requirements of the controlling federal law satisfies 2254(d)(1)'s "contrary to" clause. *Id.* at 405-06, 120 S. Ct. at 1519.

A state court decision involves an "unreasonable application" of clearly established Supreme Court precedent, and merits habeas relief, also in at least two circumstances:

> First, . . . if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, . . . if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407, 120 S. Ct. at 1520. For purposes of the "unreasonable application" analysis, the federal court must determine whether "the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-10, 120 S. Ct. at 1521.

As to § 2254(d)(2), "a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003). This Court may not characterize state-court factual determinations as unreasonable "merely because [it] would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010). Instead, § 2254(d)(2) requires that the reviewing court accord

the state trial court substantial deference. However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Miller–El*, 537 U.S. at 340, 123 S. Ct. at 1041.

Respondents invoke 28 U.S.C. § 2254(e)(1) to contend that the Eleventh Circuit applies that subsection to the exclusion of § 2254(d)(2) and presumes state court factual determinations to be correct unless rebutted by clear and convincing evidence. Section 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

However, as many courts have noted, subsections (d)(2) and (e)(1) appear to contradict one another. Subsection (d)(2) permits a federal court to grant habeas corpus relief if the state court's determination of the facts is unreasonable "in light of the evidence presented in the state court proceeding." By contrast, subsection (e)(1) appears to attach a presumption of correctness to *any* "determination of a factual issue made by a State court," a presumption that can be overcome only by "clear and convincing evidence." The distinction matters because it determines

whether a petitioner such as Clemons must show that the state court's determination of the facts was merely unreasonable or "clearly and convincingly" unreasonable. In other words, this Court's review of the state court's factual determination is more deferential if it applies (e)(1) than (d)(2).

The Eleventh Circuit has recognized that courts have "struggled to interpret how these abutting standards interact in the context of fact-based challenges to state court adjudications." *Cave*, 638 F.3d at 745. Indeed, in 2010, the Supreme Court granted certiorari to "address the relationship between §§ 2254(d)(2) and (e)(1)" and "resolve the question of how § 2254(d)(2) and (e)(1) fit together." *Wood*, 558 U.S. at 293, 300, 130 S. Ct. at 845, 849. However, after finding that the petitioner in that case could not satisfy the more liberal standard of subsection (d)(2), the Court found that there was no need to review the state determination under § 2254(e)(1). As in *Wood*, in *Cave*, the Eleventh Circuit similarly found there was no need to define the respective purviews of (d)(2) and (e)(1) because "the state court's decisions on Cave's claims were not based on unreasonable factual determinations in light of the evidence before it under any standard." 638 F.3d at 747. Because the Court finds the same is true here, it need not decide in this case whether subsection (d)(2) or (e)(1) applies.

IV.   *ATKINS* **AND ALABAMA'S APPLICATION OF IT AT THE TIME OF CLEMONS'S STATE POST-CONVICTION PROCEEDINGS IN 2004**

At the time of Clemons's trial, the Supreme Court's precedent permitted the imposition of the death penalty on "mentally retarded"[2] persons. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934 (1989). However, in 2002, the United States Supreme Court held in *Atkins* that the execution of mentally retarded individuals violates the Eighth Amendment of the Constitution. 536 U.S. at 321, 122 S. Ct. at 2252. The Court created a categorical exemption from the death penalty for mentally retarded persons based on its finding that defendants with mental retardation are less culpable because they have diminished capacities to understand and process information, to communicate, to learn from mistakes and experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. 536 U.S. at 318-20, 122 S. Ct. at 2250-52.[3]

---

[2]   The clinical field now primarily uses the term "intellectual disability" rather than "mental retardation." However, because state and federal authorities at the time of Clemons's *Atkins* hearing, and the parties and experts themselves, used the term "mental retardation," the Court will do so throughout this opinion.

[3]   In reaching that conclusion, the *Atkins* Court first noted that a punishment is prohibited by the Eighth Amendment if it is "excessive," as indicated by a punishment that is disproportionate to the offense. *Id.* at 311, 122 S. Ct. at 2246. Further, it stated that an excessiveness claim is judged by "evolving standards of decency that mark the progress of a maturing society." *Id.* at 312, 122 S. Ct. at 2247 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01, 78 S. Ct. 590, 598 (1958)). To determine the "evolving standards of decency," the *Atkins* Court looked to legislation enacted by state legislatures which it stated was the "clearest and most reliable evidence of contemporary values." *Id.* The *Atkins* Court noted that, since its decision in

The Supreme Court pointed out that, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317, 122 S. Ct. at 2250. The Court expressly left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* (quotation marks omitted and alterations adopted).

Despite charging the States with implementing *Atkins*' mandate that the execution of mentally retarded persons is unconstitutional, the Court did observe in a footnote that even though the statutory definitions of mental retardation adopted by Congress and the twenty states that already prohibited the execution of such persons were not identical, all of them "generally conform[ed] to the clinical definitions" promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association. *Id.* at 317 n.22, 122 S. Ct. at 2250 n.22. The Court embraced two clinical definitions of mental retardation—one provided by the AAMR in its <u>Mental Retardation: Definition, Classification, and</u>

---

*Penry*, 492 U.S. 302, 109 S. Ct. 2934, which rejected a challenge to the constitutionality of a death sentence imposed upon a mentally retarded criminal, fifteen states had passed statutes prohibiting the execution of mentally retarded capital murderers. *Id.* at 314-15, 122 S. Ct. 2248-49. The Court then noted, however, that it was not the number of states enacting such legislation, "but the consistency of the direction of change" that was "powerful evidence." *Id.* at 315-16, 122 S. Ct. at 2249.

Systems of Supports (9th ed. 1992) ("AAMR Manual 1992")[4] and one by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM-IV-TR"). *Id.* at 308 n.3, 122 S. Ct. at 2245 n.3. Both the AAMR Manual 1992 and DSM-IV-TR define mental retardation as (1) significantly subaverage intellectual functioning (2) accompanied by significant limitations in adaptive functioning and (3) originating before the age of 18. The Supreme Court explained these three-part definitions in *Atkins*, stating:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports (9th ed. 1992).

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the

---

[4]   This organization is now called the American Association on Intellectual and Developmental Disabilities.

> functioning of the central nervous system." Diagnostic and Statistical
> Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental
> retardation is typically used to describe people with an IQ level of 50-
> 55 to approximately 70.

*Id.* (emphasis in original).

The *Atkins* Court also explained that the Wechsler Adult Intelligence Scales

test ("WAIS-III") is "the standard instrument in the United States for assessing

intellectual functioning," which is the first of the three diagnostic criteria central to

both definitions of mental retardation quoted above. *Id.* at 309 n.5, 122 S. Ct. at

2245 n.5 (citing AAMR Manual 1992). The Court explained:

> The WAIS-III is scored by adding together the number of points
> earned on different subtests, and using a mathematical formula to
> convert this raw score into a scaled score. The test measures an
> intelligence range from 45 to 155. The mean score of the test is 100,
> which means that a person receiving a score of 100 is considered to
> have an average level of cognitive functioning. A. Kaufman & E.
> Lichtenberger, Essentials of WAISIII Assessment 60 (1999). It is
> estimated that between 1 and 3 percent of the population has an IQ
> between 70 and 75 or lower, which is typically considered the cutoff
> IQ score for the intellectual function prong of the mental retardation
> definition. 2 Kaplan & Sadock's Comprehensive Textbook of
> Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000).

*Id.* at 309 n.5, 122 S. Ct. at 2245 n.5.

Thus, although the Supreme Court instructed the States to develop

standards for identifying mentally retarded defendants, it was also instructive

regarding the nature of the factual inquiry to be taken, pointing the States in the

direction of clinical definitions of mental retardation that have three constituent parts: *i.e.*, 1) significantly substandard intellectual functioning as measured by such normative standards as the WAIS-III, which is "the standard instrument in the United States for assessing intellectual functioning," and which, when it results in an IQ score of "between 70 and 75 or lower," typically means that the subject has significantly subaverage intellectual functioning; accompanied by 2) significant limitations in adaptive skills in at least two areas such as communication, self-care, and self-direction; and, 3) both deficiencies must be manifest before the age of eighteen years. *Id.* at 308-09 n.3 & n.5, 122 S. Ct. at 2245 n.3 & n.5.

One of the first opportunities the Alabama courts had to apply *Atkins* was in the case of defendant Roy Edward Perkins, which was pending on certiorari in the Supreme Court at the time *Atkins* was decided. Because the case raised a mental retardation claim, the high court remanded the case to the Alabama Supreme Court for reconsideration in light of *Atkins*. On remand, in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), the Alabama Supreme Court noted that the state legislature had not adopted a procedure for determining whether a capital defendant is mentally retarded. *Id.* at 455. In the absence of legislative guidance, the court referenced both the clinical definitions of mental retardation considered by the Supreme Court in *Atkins*, *i.e.*, those promulgated by the AAMR and the American Psychiatric

Association, *supra*, as well as the mental retardation statutes of those states prohibiting the imposition of the death penalty on a mentally retarded defendant, stating:

> [T]his Court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).

*Id.* at 456.

The court noted in support of its conclusion that Perkins was not mentally retarded that he had been tested as an adult and achieved a full scale IQ score of 76, and that an expert had concluded he was in the borderline range of intelligence but was not mentally retarded. *Id.* The court also examined Perkins's adaptive functioning and concluded that he had no substantial deficits in that domain prior to the age of 18. *Id.* In support, the court noted that "Perkins was able to have interpersonal relationships. Indeed, he was married for 10 years. He maintained a job as an electrician for a short period." *Id.*

Roughly a year after *Perkins*, the Alabama Supreme Court applied the standard from *Perkins* in *Ex parte Smith*, noting that a full-scale IQ of 72 "seriously

undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions." 2003 WL 1145475, at *9 (Ala. 2003).

## V.    THE CLAIM

Clemons raises three arguments in support of his *Atkins* claim: 1) the traditional deference owed to state court judgments under § 2254(d) is inapplicable because the circuit court failed to exercise independent judgment, as evidenced by its verbatim adoption of the Attorney General's 90-page proposed order denying his *Atkins* claim; 2) § 2254(d)(2) compels relief because the Alabama courts' factual determination that he is not mentally retarded was unreasonable in light of the facts before it, and 3) § 2254(d)(1) also compels relief because the Alabama courts' decision denying his claim was contrary to or was an unreasonable application of clearly established Federal law, *i.e*, *Atkins*. Each argument is addressed in turn.

### A.    The Effect, if Any, of the Circuit Court's Adoption of the Attorney General's Proposed Order

It is obvious from comparing the proposed order drafted by the Attorney General's office and the order signed by the circuit court that they are nearly identical, inclusive of various typos and other errors. Courts have certainly criticized the practice of the mechanical adoption of proposed findings of fact

prepared by prevailing parties and condemned the ghostwriting of judicial orders. *See, e.g., Anderson v. City of Bessemer*, 470 U.S. 564, 572, 105 S. Ct. 1504, 1510 (1985); *In re Colony Square Co.*, 819 F.2d 272, 274 (11th Cir. 1987). These practices lead to the "utter lack of an appearance of impartiality." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997). However, Clemons offers no authority for the proposition, and the Court can independently find none, mandating that such a practice by a state post conviction court in-and-of-itself warrants habeas relief to a petitioner under § 2254(d)(1) or (2). *Jefferson v. Upton*, 560 U.S. 284, 130 S. Ct. 2217 (2010), relied upon by Clemons, is distinguishable in several respects. First, that case was decided under the pre-AEDPA version of § 2254(d). *See id.* at 289, 130 S. Ct. at 2220. Second, in that case the attorneys for the State of Georgia drafted the order denying the state habeas petitioner's claims pursuant to an *ex parte* request from the state-court judge, who made no such request of the petitioner. *Id.* at 292, 130 S. Ct. at 2222. In Clemons's case, the circuit court indicated at the conclusion of the four-day evidentiary hearing that it was inclined to find that Clemons is not mentally retarded but requested proposed orders from both parties. Indeed, both submitted proposed orders. Clemons has not demonstrated that § 2254(d) should not apply under these circumstances.

### B.      Whether Clemons Has Established that § 2254(d)(2) Applies

The ACCA[5] stated the following with regard to why Clemons's *Atkins* claim

failed:

> The appellant argues that he is mentally retarded and that, therefore,
> his sentence of death is unauthorized as a matter of law. In *Atkins v.
> Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252, 153 L.Ed.2d 335
> (2002), the Supreme Court held:
>
> > "We are not persuaded that the execution of mentally
> > retarded criminals will measurably advance the deterrent
> > or the retributive purpose of the death penalty.
> > Construing and applying the Eighth Amendment in the
> > light of our 'evolving standards of decency,' we therefore
> > conclude that such punishment is excessive and that the
> > Constitution 'places a substantive restriction on the
> > State's power to take the life' of a mentally retarded
> > offender."
>
> Subsequently, in *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002), the
> Alabama Supreme Court stated:
>
> > "[T]his Court can determine, based on the facts
> > presented at Perkins's trial, that Perkins, even under the
> > broadest definition of mental retardation, is not mentally
> > retarded. Those states with statutes prohibiting the
> > execution of a mentally retarded defendant require that a
> > defendant, to be considered mentally retarded, must have
> > significantly subaverage intellectual functioning (an IQ of

---

[5]    The ACCA is the highest Alabama court to have provided any analysis on the merits of
Clemons's *Atkins* claim, thus the Court looks to its reasoning for § 2254(d) purposes. *See Ylst v.
Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991) ("Where there has been one
reasoned state judgment rejecting a federal claim," federal habeas courts should presume that
"later unexplained orders upholding that judgment or rejecting the same claim rest upon the
same ground."). However, the Court notes that for purposes of the § 2254(d)(2) analysis, this
Court may look to the fact findings of both the circuit court and the ACCA, as the ACCA in large
part merely quoted the circuit court's order. *See Hannon v. Sec'y, Dep't of Corr.*, 562 F.3d 1146,
1150 (11th Cir. 2009) (noting that AEDPA deference to the fact findings of state courts "applies
to fact findings made by both state trial courts and state appellate courts").

70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."

*See also Ex parte Smith*, [Ms. 1010267, March 14, 2003] --- So.2d --- (Ala. 2003).

The parties presented extensive and often conflicting evidence regarding whether the appellant is mentally retarded. In its order denying the petition, the circuit court made the following findings:

"[I]t is clear that Clemons does not meet either the intelligence or adaptive functioning elements to establish mental retardation.

"The Court first addresses the intelligence component in determining whether Clemons is mentally retarded.

"Clemons has been administered intelligence testing on numerous occasions, and his scores are remarkable in their divergence, ranging from a low of 51 to a high of 84. The scores are most likely divergent because Clemons frequently malingers when he is tested, a conclusion that was drawn by many of the mental health professionals who have examined Clemons. Because Clemons has taken so many intelligence tests, the Court will list them in chronological fashion.

"Clemons was first administered an intelligence test, the Stanford–Binet Intelligence Test, when he was six and a half years old. EH at 53. Clemons scored a 77 on the test which placed him in the borderline range of intelligence. Despite this fact, his school records indicate that he was labeled 'educable mentally retarded' soon after taking this test. Clemons' school records which tend to indicate minimal academic achievement were consistent with his relatively low score on the Stanford–Binet Intelligence Test. They show that by the end of the elementary school, Clemons was two years behind and that he

completed the tenth grade and did not receive a high school diploma. Petitioner's Exhibits 2–5. The records do not show that Clemons was administered any additional intelligence tests throughout his school career.

"Clemons, while in prison at age 19, was administered a BETA–II intelligence test on which he scored a full-scale IQ of 84. R32 Vol. 7 at 1317, 1326. This test result was the highest score that Clemons ever achieved. In the fall of 1992, after being charged in both state and federal court with murdering a federal law enforcement official, Clemons began the first of three rounds of testing by various mental health professionals.

"During a court-ordered forensic evaluation at a federal prison in Butner, North Carolina, Clemons was administered various psychological tests including an intelligence test. Clemons was administered the Wechsler Adult Intelligence Scale–Revised (WAIS–R) and scored a full-scale IQ of 51. R32 Vol. 7 at 1323. The psychologist who administered this test was dubious that he had obtained a valid result. He stated that people in the low–50s IQ range are 'often in need of structured living and may be institutionalized' and are typically unable to care for their basic needs. *Id.* The Butner report further states that '[i]t would be virtually impossible for a person with an IQ of 51 (from the present testing) to earn a score of 84 on the BETA–II only one year previous.' *Id.* The psychologist who conducted the testing noted that when he tried to obtain a writing sample Clemons wrote with his left hand even though he is right handed, another indicator that Clemons was not giving his best effort. R32 Vol. 7 at 1324. The psychologist ultimately concluded that Clemons was in the borderline range of intellectual functioning and that the results of the testing were invalid because Clemons was malingering. R32 Vol. 7 at 1325. FN 1

> FN 1. The examiners noted the appellant's lack of participation in the testing and concluded:

"[T]he present psychological testing of Mr. Clemons' intellectual ability must be considered invalid. It seems clear that Mr. Clemons did not provide a sincere effort and very likely purposely presented an appearance of impaired ability. Based on previous results, educational history, and impressions from his relatives, Mr. Clemons is probably functioning in the borderline range of intellectual ability. It is unlikely that he falls in the range of mild mental retardation. Regardless of his formal IQ level, his social, educational, and occupational functioning do not suggest significant intellectual impairment."

(C.R. 1324.) The examiners further noted:

"The diagnosis of malingering was made to describe a pattern of voluntary behavior and it is not considered to be a mental disorder. The evidence that Mr. Clemons was malingering mental disorders was quite detailed and can be divided in two areas: a) malingering of psychotic symptoms (e.g., hallucinations of little green men); and b) malingering of cognitive deficits. The psychotic symptoms that Mr. Clemons described are very implausible. Clearly defined visual hallucinations are quite rare. In addition, people who experience genuine hallucinations report that they are not constant experiences and that distractions, such as singing or exercise, will temporarily make the hallucinations decrease or disappear entirely. Mr. Clemons denied this. Mr. Clemons' own discussions about his symptoms were inconsistent. For example, telling one staff member everyone should be able to see what he claimed and telling someone else the next day that nobody else could see them. In addition, people with genuine psychotic disorders often neglect

their personal hygiene, but Mr. Clemons was consistently careful to maintain his hygiene and personal appearance. Finally, there was no evidence of disordered thought processes such as tangentiality, circumstantiality, loose associations, thought blocking, or disorganization. Such disrupted thinking processes are nearly universally present among people who suffer genuine hallucinations to the degree Mr. Clemons reports. In sum, there are numerous inconsistencies with Mr. Clemons' reports and what is known about people who suffer genuine psychotic thought disorders."

(C.R. 1325.)

"Before his trial in federal court, Clemons' attorneys had Clemons evaluated by Dr. William Grant, a psychiatrist. R32 Vol. 7 at 1289–1301. Although Dr. Grant did not conduct any intelligence tests or psychological tests, he agreed with the psychologist at Butner Correctional Facility that Clemons was malingering. Dr. Grant's report indicated that Clemons entered the interview room 'laughing hysterically and incessantly.' R32 Vol. 7 at 1290. His report indicated that Clemons stopped laughing when he was informed that 'faking' would not be in his best interest. *Id.* Dr. Grant's overall conclusions were that Clemons was malingering and that he was antisocial. R32 Vol. 7 at 1299. Dr. Rivenbark, at Taylor Hardin Secure Medical Facility, evaluated Clemons in 1992 and 1994 and also concluded that Clemons was malingering. R32 Vol. 7 at 1281, R32 Vol. 29 at 5646. Dr. Rivenbark apparently did not perform any testing on Clemons. FN 2

> FN 2. While he was awaiting trial in Alabama, the appellant was evaluated at Taylor Hardin Secure Medical Facility in July 1994. One examiner, who was not able to complete all of the tests because the

appellant was not cooperative, made the following observation:

"Based upon the information available to me, it is my opinion that Mr. Clemons' silence and lack of cooperation were deliberate and conscious decisions and were not due to any significant mental disease or defect. Furthermore, given the information gathered by other examiners since my initial evaluation I am more convinced than ever that he has been deliberately malingering concerning his intellectual ability and his mental state.

. . . .

". . . Mr. Clemons' intelligence probably falls somewhere in the mid 70's to mid 80's, which is within the Borderline to Low Average range of intelligence."

(C.R. 1309–10.)

"The second round of testing occurred before Clemons' first Rule 32 evidentiary hearing held in 2001. Dr. Kimberly Ackerson, a psychologist practicing in Birmingham, was hired by Clemons' present counsel to perform a psychological evaluation of Clemons. As a part of this evaluation, she administered various tests including the Wechsler Adult Intelligence Scale–Revised (WAIS-R). Clemons obtained a full-scale IQ of 73 on this intelligence test. On the score sheet, Dr. Ackerson noted that Clemons appeared motivated and that he was deliberate in making his responses. Dr. Ackerson stated that Clemons' score placed him in the 'borderline' classification. Dr. Ackerson testified at the Rule 32 evidentiary hearing conducted in 2001 but was not called as a witness at the most recent Rule 32 evidentiary hearing conducted in June 2004.

"Dr. Glen King, a board-certified clinical psychologist, was hired by the Attorney General's Office to perform a psychological evaluation of Clemons before the first Rule 32 evidentiary hearing. Dr. King was not called as a witness at the first Rule 32 evidentiary hearing but was called at the recent Rule 32 evidentiary hearing and testified, among other things, about the testing he performed in 2001. In February 2001, Dr. King administered the Wechsler Adult Intelligence Scale–Third Edition (WAIS–III) to Clemons and obtained a full-scale IQ score of 77. EH at 771. Dr. King stated that Clemons had a nine-point difference between the verbal and performance IQ score which was 'a little larger than we would like to see' but stated that the difference could be attributed to Clemons' low score on the 'digit symbol coding' test where it did not appear that Clemons was '. . . trying hard.' EH at 773. Dr. King stated that Clemons' full scale IQ score 'indicates functioning in the general area that we call borderline intellectual ability, which is between mentally retarded functioning and the average.' EH at 771. During this same round of testing, Dr. King stated that he administered the spelling and reading portion of the 'Wide Range Achievement Test—Third Edition' which is a measure of academic achievement. EH at 778–79. Clemons scored a 98 on the reading part and a 96 on the spelling part which equates to Clemons being able to read and spell at the 'high school level.' EH at 779.

"The third round of testing occurred after the Court of Criminal Appeals remanded the case for this Court to determine, among other things, whether Clemons is mentally retarded. In February 2004, Dr. King administered the Halsted–Reitan test battery which includes the original version of the Wechsler, the Wechsler Adult Intelligence Scale (WAIS). Dr. King testified that he noticed Clemons was much more indifferent in his attitude during the more recent testing. EH at 784. During the testing, Clemons did not appear to be motivated to give his best effort and even claimed that the 'right side' of his body was going numb to the point that he was paralyzed. EH at 784–85. Dr. King stated that he had not seen

anything in Clemons' medical history that indicated Clemons suffers from temporary paralysis in his right side. EH at 786. On the WAIS, Clemons obtained a full-scale IQ score of 67. Because the WAIS is considered an easier test than the WAIS–III, Dr. King subtracted seven points from the results of the WAIS so that those scores would equate with the results of the WAIS–III. EH at 792–93. Therefore, Clemons' full-scale IQ score on the WAIS is 60 as compared with the full-scale IQ of 77 that Clemons received three years previous on the WAIS–III.FN 3 Dr. King stated that without some intervening event such as a stroke, physical problem, or serious disease it is difficult to account for a 17–point drop in a full-scale IQ score. EH at 793. Dr. King concluded that Clemons was malingering in an effort to score lower on the WAIS that was given in 2004.FN 4 Dr. King's overall assessment is that Clemons functions in the 'borderline range of intellectual ability.' EH at 819.

> FN 3. With regard to the disparity in the appellant's test scores from 2001 and 2004, the following occurred:
>
> "[STATE:] Is it possible that Mr. Clemons' full scale IQ would drop seventeen points from seventy-seven to sixty in about three years?
>
> "[KING:] Not ordinarily without some kind of intervening event, like stroke or serious disease or development of some physical problem that might account for that.
>
> "[STATE:] Are you aware of any such?
>
> "[KING:] I am not.
>
> "[STATE:] So what is your interpretation of his scores on the WAIS?

"[KING:] That he was dissembling; in other words, that he was not providing his best effort on many of the subtests.

"[STATE:] Do certain portions of the WAIS and the WAIS–III contain—such as the vocabulary and similarities sections, contain some of the same questions?

"[KING:] Yes, they do. Some things overlap.

"[STATE:] Were there any questions that he got wrong in 2004 on the WAIS that he actually got right in 2001 on the WAIS–III?

"[KING:] For example, on the vocabulary items when asked to define winter, in 2001 he gave a two-point response saying it was the cold time of the year. And in 2004 he said it was fall, which would be a zero response.

"In 2001 when asked the question on comprehension, 'what should you do if you find an envelope in the street that is sealed and addressed and has a new 'stamp'? In 2001 he indicated 'put it in a mailbox' and in 2004 he said 'look at it'?

. . .

"[STATE:] Could you please tell us, Doctor, what those differing answers might indicate to you?

"[KING:] In my experience, they indicate to me clearly the presence for malingering, giving false answers in a purposeful fashion."

(Remand R. 793–96.)

32

> FN 4. King also administered the Test of Memory Malingering ("TOMM"). The scores indicated that the appellant was malingering for memory difficulties and appeared to give incorrect responses to every third item on the test. (Remand R. 789.)

"Dr. Golden, the psychologist hired by Clemons' present counsel to perform a psychological evaluation, administered the Stanford–Binet Intelligence Scale–Fourth Edition to Clemons on October 23, 2003. EH at 133. Dr. Golden testified that he gave this particular intelligence test because it is a better measure of intelligence for a person who is mentally retarded. EH at 133–37. Dr. Golden did not support this conclusion, however, with literature from any journals. Clemons achieved a full-scale IQ score of 58 on the Stanford–Binet administered by Dr. Golden. EH at 139. However, Dr. Golden stated that because the Stanford–Binet uses a 'slightly different scoring system' from the Wechsler test, Clemons' scores should be adjusted upward by three, thus giving Clemons a full-scale IQ score of 61. EH at 139. Dr. Golden then stated that this score was 'probably an overcorrection.' *Id.* Dr. Golden then performed another calculation:

> "'Probably a better estimate of the Binet IQ is to average these four scores together [verbal reasoning–62; abstract visual reasoning–62; quantitative reasoning–59; short term memory–68], which actually gives you a score of sixty-six overall as his IQ. And this is the more comparable score to what we are working on with the WAIS.'

"EH at 139 and 140. Dr. Golden gave no justification on why these additional calculations were necessary to derive Clemons' full-scale IQ score.

"Dr. King testified that he was not aware of any information that requires a psychologist to scale an IQ score that is attained

on the Stanford–Binet test. EH at 823–24. In fact, Dr. King stated that '[t]he Stanford–Binet Intelligence Scale as Revised uses norms like other tests, and you come up with an IQ score based on those norms and that's the IQ score.' EH at 824. During the evidentiary hearing, Clemons presented no evidence to support Dr. Golden's assertion that it is necessary to scale scores upward that are obtained from the administration of the Stanford–Binet Intelligence Test.

"As can be seen above, Clemons' IQ scores vary widely from a low of 51 on the WAIS–R given at the Butner Correctional Facility in fall 1992 to a high of 84 on the BETA–II, apparently administered by the Alabama Department of Corrections sometime in 1991. The evidence demonstrates that when Clemons puts forward effort, he consistently scores in the 70–80 range on intelligence tests. These scores place him in the borderline range of intellectual functioning and establish that he is not mentally retarded. The testing revealed that Clemons scored below 70 three times, twice as a part of the latest round of testing when Clemons was presumably aware of the Court of Criminal Appeals' remand on the mental retardation issue. In the fall of 1992, Clemons scored a 51 on the WAIS–R, a score which was discounted by the test administrator because it was inconsistent with the 84 score that Clemons achieved on the BETA–II the previous year. R32 Vol. 7 1323. The psychologist at Butner stated that a person scoring a 51 on an intelligence test would possibly have to be institutionalized and not be able to take care of basic needs. *Id.* Despite Clemons' score of 51, the psychologist at Butner found that Clemons was functioning in the borderline range. R32 Vol. 7 at 1325.

"During the most recent round of testing, Clemons scored below 70 on tests administered by Dr. Golden and Dr. King. Clemons obtained a 58 on the Stanford–Binet administered by Dr. Golden who offered cryptic explanations in an effort to demonstrate that a 58 really meant that Clemons scored a 66. Dr. King stated that he was unaware of any reason why the final score on a Stanford–Binet becomes another score. Clemons was

offered the chance to present rebuttal evidence and never
refuted Dr. King's statement. The Court finds that Clemons
received a 58 full-scale IQ on the test administered by Dr.
Golden and that Dr. Golden offered incredible reasons in an
effort to make the score appear more consistent with Clemons'
other scores. Dr. King, during the most recent round of testing,
administered the original version of the Wechsler as a part of a
neuropsychological test battery and obtained a full-scale IQ
score of 67. Dr. King then scaled the score to a 60 to make the
score equivalent to a score derived on the WAIS–III because the
WAIS is an easier test than the WAIS–III. EH at 792. Again,
despite being given the opportunity to present rebuttal
evidence, Clemons never refuted Dr. King's statement that the
WAIS should be scaled down if the score is to be given a WAIS–
III equivalent score.FN 5

> FN 5. Another expert who was retained by the
> appellant's attorneys, Dr. Joseph Chong–Sang Wu,
> an associate professor at the University of
> California Irvine College of Medicine and clinical
> director of the University of California Irvine–
> Brain Imaging Center, testified that he came to
> Alabama to perform a Positron Emission
> Tomograph ("PET") scan on the appellant. Based
> on the results, he concluded that the appellant had
> brain damage.
>
> Dr. Helen Mayberg, a neurologist who was
> retained by the State, testified that the PET scan
> was not considered reliable for the purpose for
> which it was used by Dr. Wu. She further testified
> that her review of the PET scan findings showed
> that the appellant had normal brain activity and did
> not have a brain injury.
>
> The appellant attempted to use the PET scan
> results to show that he had suffered from a brain
> injury at or near birth. The appellant was born in

1971, and the test was conducted in 2004. Also, Wu conceded that none of the scientific journals or studies supported the use of a PET scan as a diagnostic tool to ascertain old brain injuries. The appellant could not show that the PET scan was reliable and generally accepted in the scientific community to diagnose 30–year–old brain injuries. Therefore, the circuit court properly found that the PET scan results were not admissible because they did not satisfy the *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), test.

"Therefore, the Court finds that Clemons does not satisfy the criteria to establish mental retardation under the intellectual functioning element. The evidence demonstrates that when Clemons puts forward some effort he consistently scores in the 70–80 range on intelligence tests. Further, the evidence demonstrates that when Clemons malingers he consistently scores in the 50–60 range. Clemons has failed to establish that he meets the criteria to establish 'significantly subaverage general intellectual functioning.' Because Clemons has not established this criteria, he is not mentally retarded.

"Notwithstanding the above finding that [the] Petitioner is not mentally retarded, the Court also addresses the adaptive functioning element of mental retardation.

"As previously stated, the state appellate courts have looked to various factors in examining whether a criminal is mentally retarded and therefore exempt from the death penalty. *Perkins*, 851 So.2d at 456; *Smith*, [Ms. 1010267, March 14, 2003] ––– So.3d at ––––; *Stallworth* [*v. State*], 868 So.2d [1128] at 1182 [(Ala. Crim. App. 2001) ]. Among these factors are: employment history, the ability to have interpersonal relationships, being extensively involved in criminal activity, post-crime craftiness on the part of the criminal, and being able to use community resources. The record demonstrates that all

of the above-mentioned factors apply to Clemons and establish that he is not mentally retarded.

"Even though Clemons went to jail when he was 19 years old and therefore did not have much of an opportunity to hold many jobs, the record demonstrates that he was still able to hold a few jobs. The Butner report indicates that '[Clemons] has held a variety of unskilled positions, none lasting more than a few months.' R32 Vol. 7 at 1317. Clemons' most notable job was as a delivery driver for Domino's pizza. Daryl Pritchett, the manager who employed Clemons, testified at the first Rule 32 hearing that this job requires an individual to have a valid driver's license. R32 Vol. 36 at 304–05. Clemons' grandfather had purchased a car for Clemons so that he could work at Domino's. R32 Vol. 36 at 300. Although Pritchett said that Clemons returned more pizzas than other delivery drivers, he recalled that if Clemons was familiar with the neighborhood he would not have trouble delivering the pizza. R32 Vol. 36 at 307. Pritchett said that a delivery driver was expected to be able to make change out of the 'bank' that was provided to them at the beginning of the shift without the benefit of a calculator. R32 Vol. 36 at 309. Pritchett admitted that sometimes Clemons would 'come up short' when all of his receipts were reconciled at the end of the evening. *Id.* Clemons' work performance was satisfactory, however, but he just stopped coming to work after a month or two. R32 Vol. 36 at 306.

"The lack of an employment history is perhaps better explained by Clemons' lack of desire rather than inferior adaptive functioning. As the psychologist at Butner Correctional Facility stated:

> "'In addition to outright illegal behavior, Mr. Clemons has never chosen to support himself or be responsible for his own needs. He has lived with relatives, even as an adult, has not maintained employment, and has spent his time engaged in illegal behavior, substance abuse, and promiscuous sexual activity.'

"R32 Vol. 7 at 1325. If Clemons has a lack of employment history, this Court finds the records introduced during the Rule 32 proceedings establish it is due to a lack of motivation on his part to find work.

"Clemons had the ability to form interpersonal relationships with women, a factor the appellate courts have ruled has relevance in examining whether a criminal defendant is mentally retarded. *Smith*. . . . The Butner report indicates that Clemons had a number of relationships with women. Clemons stated that he had numerous relationships with women and one serious relationship. R32 Vol. 7 at 1317. Clemons stated that he fathered at least two children but because he had been with so many women, he did not remember the names of the women who bore his children. *Id.*

"Clemons' post-crime conduct supports the notion that he was a crafty criminal intent on minimizing his culpability and establishing a defense to his crime, another factor indicating Clemons does not have substantial deficits in adaptive functioning. After being placed under arrest, Clemons gave a statement to the FBI. Supp.R.-Exhibits Vol. 4 at p. 1 (unnumbered pages). In the statement, Clemons in a clever way minimized his criminal culpability and even attempted to establish that he was defending himself when he killed Agent Althouse. Clemons stated that on the day of the crime, he was picked up by Kenny Reid and Dedrick Smith who both had guns and were talking about taking cars at gunpoint. *Id.* As they were riding around looking for cars, Clemons told them, 'if you're going to take cars, take me home.' *Id.* They saw a black Camaro at a convenience store and Reid and Smith told Clemons to take the car. *Id.* at p. 2. When Clemons hesitated, they taunted him. *Id.* As Clemons exited the car, they threw a gun for him to use. *Id.* As Clemons approached the car, he noticed a white male in the passenger seat talking on a cell phone. *Id.* When Clemons pointed the gun at Agent Althouse and said he was taking the car, Althouse dropped the phone and stated, '[O]kay, sure.' *Id.*

Clemons stated that Agent Althouse then smirked and pulled a gun from his 'rear area' and appeared as if he was going to shoot Clemons. *Id.* After Clemons observed Agent Althouse draw the gun, Clemons 'poured' his gun, meaning that he fired a number of rounds. *Id.* This statement reflects Clemons' criminal sophistication in that he attempted to make himself look like a follower and, at the same time, contend he killed only in self defense.

"Other facts presented at Clemons' trial demonstrate that Clemons' statement contained numerous false statements. A week before the murder, Herman Shannon testified that Clemons came to his house and asked if anyone had a gun. R. 1423. Shannon gave Clemons a gun and testified that it was the same gun Clemons was in possession of immediately after the crime occurred. R. 1423. Shannon's testimony indicates that Clemons acted with premeditation by obtaining a gun a week before he carried out the carjacking. Kenny Reid testified that on the night of the crime they were traveling down Highway 280 when Clemons told Smith to pull into the Chevron gas station. R. 1327–28. Clemons, referring to a car parked at the gas station, yelled 'that's it, right there.' R. 1329. Smith let Clemons out and parked at the Wendy's next door to the gas station. R. 1330. Soon thereafter, Reid heard two gunshots and then several more rounds of shots and saw Clemons drive through a red light at a high rate of speed. R. 1331–32. Reid said that when he saw Clemons later that night, Clemons instructed him not to talk because he had killed a DEA man. R. 1335. Leon Johnson, who was at the house where Clemons drove immediately after the murder, stated that Clemons said he would kill him if he talked to the police. R. 1449. These facts demonstrate that Clemons was not an unwitting follower due to his low intelligence but rather that he had a deliberate plan to carjack a car.

"Another factor relative to adaptive functioning is being extensively involved in criminal activity. *Smith*. . . . There was evidence presented at trial that indicated Clemons carjacked

cars on three separate occasions at gunpoint. R. 1478–80, 1493–99, 1503–08. In all of these crimes, Clemons committed the forcible taking of the car without any assistance. Clemons' ability to repeatedly engage in illegal behavior refutes the notion that he had significant limitations in adaptive behavior.

"Finally, the state courts have indicated that being able to use community resources is relevant in determining adaptive functioning. In *Stallworth*, 868 So.2d at 1182, the Court of Criminal Appeals indicated that a person qualifying for food stamps is evidence of adequate adaptive skills. After Clemons killed Agent Althouse, he soon fled the Birmingham area and left for Cleveland, where he had family. Clemons was transported to Cleveland on a Greyhound Bus, which is an indication that Clemons could use the community resource of public transportation.

"All of the above various factors refute Clemons' contention that he has significant limitations in adaptive behavior. Two of the psychologists that have examined Clemons have stated that he does not have significant limitations in adaptive functioning. Dr. King stated the following:

> "'In addition, by history, Mr. Clemons had a driver's license, he worked some places for a year at a time. He was able to matriculate through school to the tenth grade, even if he stopped at that point. He has literacy levels that seem to vary by whoever is giving him the test and under what circumstances, but clearly with me he was able to recognize words and spell words, rather sophisticated words, at about a high school level with ninety-eight, ninety-six scores.'

"EH at 836. Dr. Grant, who was hired by Clemons' attorneys to perform an evaluation before the federal trial, found that Clemons was a hardened criminal who demonstrated adaptive skills in prison that refuted any notion that he was mentally retarded:

"'Data from Jefferson County Jail personnel indicate that Mr. Clemons is currently housed on a violent floor with twenty-two other violent criminals. Individuals with low IQs in this setting tend to be victimized by other inmates, who steal food off their trays, their money, and their candy (the Defendant arrived at the interview carrying candy). Defendants in this setting who are mentally slow, typically get into fights or have to be put in protective custody on the medical unit. Mr. Clemons' survival on a violent unit may attest to his true ability to function.'

"R32 Vol. 7 at 1298–99. Clemons has not demonstrated that he has significant limitations in adaptive functioning.

"The third element to prove mental retardation is that significantly subaverage intellectual functioning and significant deficits in adaptive behavior must occur before the age of 18. *Ex parte Perkins*, 851 So.2d at 456; *Ex parte Smith*. . . . Clemons was first administered an intelligence test when he was six and a half years old, scoring a 77 on the test which placed him in the borderline range of intelligence. Clemons was apparently not administered any more intelligence tests until he was past age 18. The Alabama Supreme Court has ruled that scores above 70 place a defendant above the cut-off to establish significantly subaverage intellectual functioning. *Ex parte Perkins*, 851 So. 2d at 456; *Ex parte Smith*. . . . Clemons likewise did not produce any evidence of significant deficits of adaptive functioning before age 18.

"For the foregoing reasons, this Court finds that Clemons is not mentally retarded."

(Remand C.R. 9–29) (footnotes omitted).

We have reviewed the record in light of *Perkins* and *Smith*, and we conclude that it supports the circuit court's findings. Therefore, we adopt those findings as part of this opinion. Based on the record before

us, we conclude that, even under the broadest definition of mental retardation, the appellant is not mentally retarded and that imposition of the death penalty in his case would not be unconstitutional.FN 6

> FN 6. The appellant argues that he was entitled to have a jury empaneled to determine whether he was mentally retarded. However, he did not first present this argument to the circuit court. Therefore, it is not properly before this court. *See Pate v. State*, 601 So. 2d 210 (Ala. Crim. App. 1992).

*Clemons*, 55 So. 3d at 323-32.

To succeed on his claim, Clemons must establish that the state courts' determination that Clemons is not mentally retarded, which is a finding of fact, *see Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014), is objectively unreasonable based on the record. The Court will address each of the three underlying factual determinations on which the circuit court's order was premised—that Clemons's IQ scores were inconsistent with a diagnosis of mental retardation, that he presented no evidence of adaptive impairment, and that these limitations did not originate before he turned 18. Here, upon examination of the record before the state court, the Court cannot conclude that any of the three critical factual determinations was objectively unreasonable.

### 1.    Significantly Subaverage Intellectual Functioning

The first prong of the mental retardation test is satisfied upon a showing that a person exhibits "significantly subaverage" intellectual functioning. *Atkins*, 536

42

U.S. at 308 n.3, 122 S. Ct. at 2245 n.3 (quoting the AAMR Manual 1992 and the DSM-IV-TR). The circuit court determined that Clemons failed to establish that he met this prong because "when Clemons puts forward some effort he consistently scores in the 70-80 range on intelligence tests. Further, . . . when Clemons malingers he consistently scores in the 50-60 range." 55 So. 3d at 327-28. Clemons argues that this determination was unreasonable based on the facts that were before the court because it does not take into account the Standard Error of Measurement ("SEM"), which is the concept that obtained IQ test scores actually represent a range of several points in either direction. Clemons's argument fails, however, for two reasons. First, there no indication that the circuit court did *not* apply the SEM in calculating his scores. Second, even when one takes the SEM into account, the mean of the scores from the few IQ tests that were not discredited as invalid by the circuit court still results in an IQ score that does not fall within *Atkins*'s significantly subaverage intellectual functioning definition.

As Clemons points out, both the AAMR Manual and the American Psychiatric Association's DSM-IV-TR, which contain the clinical definitions of mental retardation that the Supreme Court discussed in *Atkins*, mandate that in order to accurately assess a subject's intellectual functioning through the use of

intelligence tests, consideration must be given to the SEM.[6] According to the

AAMR Manual in effect at the time of Clemons's *Atkins* hearing in 2004, "[t]he

criterion for diagnosis is approximately two standard deviations below the mean,

considering the standard error of measurement for the specific assessment

instruments used and the instruments' strengths and limitations." Am. Ass'n on

Mental Retardation, <u>Mental Retardation: Definition, Classification, and Systems of</u>

<u>Support</u> 13, 58 (10th ed. 2002) ("AAMR Manual 2002"). On page 57, the AAMR

Manual 2002 further explains:

> The assessment of intellectual functioning through the primary
> reliance on intelligence tests is fraught with the potential for misuse if
> consideration is not given to possible errors in measurement. An
> obtained IQ standard score must always be considered in terms of the
> accuracy of its measurement. Because all measurement, and
> particularly psychological measurement, has some potential for error,
> obtained scores may actually represent a range of several points. . . .
> This process is facilitated by considering the concept of standard error
> of measurement (SEM), which has been estimated to be three to five
> points for well-standardized measures of general intellectual
> functioning.

The AAMR Manual notes that a standard deviation from a mean of 100 is 15 points

on the Wechsler Adult Intelligence Scales ("WAIS") and 16 points on the

Stanford-Binet, 4th edition—"the two instruments most commonly used to assess

---

[6]    For purposes of this opinion, the Court refers both to the 1992 AAMR Manual cited in
*Atkins*, the 2002 edition in effect at the time of Clemons's *Atkins* evidentiary hearing in 2004,
and to the DSM-IV-TR, which was in effect at the time of the hearing and when *Atkins* was
decided.

intelligence"—and the SEM on most IQ tests is approximately three to four points. 20 AAMR Manual 2002 at 57, 61-62. Thus, an IQ of 70—two standard deviations below the mean on the WAIS—"is most accurately understood not as a precise score, but as a range of confidence with parameters of at least one SEM (*i.e.*, scores of about 66 to 74; 66% probability), or parameters of two SEMs (*i.e.*, scores of 62 to 78; 95% probability)." *Id.* at 57. Indeed, the AAMR Manual 2002 further states:

> [T]his expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error. Any trained examiner is aware that all tests contain measurement error; many present scores as confidence bands rather than finite scores. Incorporating measurement error in the definition of mental retardation serves to remind test administrators (who should understand the concept) that an achieved Wechsler IQ score of 65 means that one can be about 95% confident that the true score is somewhere between 59 and 71.

AAMR Manual 2002 at 59 (emphasis added). Similarly, the DSM-IV-TR in effect at the time of Clemons's *Atkins* hearing similarly defined "significantly subaverage intellectual functioning" as "an IQ of about 70 or below (approximately two standard deviations below the mean)," but it also emphasized the importance of the SEM:

> [T]here is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65-75). *Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.*

DSM-IV-TR at 41-42 (emphasis added). It is thus clear that neither the AAMR nor the American Psychiatric Association advocated at the time of Clemons's *Atkins* hearing a fixed, finite IQ score of 70 to separate persons who are mentally retarded from those who are not. The *Atkins* Court acknowledged the existence of the SEM when it referenced that an IQ of "between 70 and 75 or lower [] is typically considered the cutoff IQ score for the intellectual functioning prong of the mental retardation definition." 538 U.S. at 309 n.5, 122 S. Ct. at 2245 n.5.

There is no indication from the circuit court's order that it did *not* consider the SEM in calculating Clemons's IQ. To the contrary, the circuit court expressly recognized the existence of the SEM in a part of the order not reproduced by the ACCA on appeal, as follows:

> Even though the *Atkins* Court did not create a national standard to determine mental retardation, it did list the definitions of mental retardation as promulgated by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association. [*Atkins*, 536 U.S.] at 308 n. 3. The most recent definition of mental retardation disseminated by the AAMR states that "[m]ental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."FN 1 The AAMR further states that this disability must originate before the age of 19. *See* www.aamr. Org/Policies. "In regard to the intellectual criterion for the diagnosis of mental retardation, mental retardation is generally thought to be present if an individual has an IQ test score of approximately 70 or below." *Id. Any IQ test score should be considered in light of the standard error of measurement, which is generally +/- 5. Id.*

> FN 1. The *Atkins* Court cited the Ninth Edition definition of mental retardation as promulgated by the AAMR in 1992. *Atkins*, 536 U.S. at 308 n.3. The AAMR's most recent definition of mental retardation can be found on its website. *See* www.aamr.org/Policies.

[R. EMC_644 (emphasis added).] Additionally, the two experts who testified at Clemons's *Atkins* evidentiary hearing, Dr. Golden for Clemons and Dr. King for the State, recognized the existence of the SEM, actually discussing it in some detail, and agreed that the proper range was five points. [R. EMC_911 (Dr. Golden noting a measurement error of five points for IQ tests); R. EMC_1633 (Dr. King conceding that the appropriate SEM is plus or minus five points).] Granted, the Alabama Supreme Court at the time presumably did not acknowledge or utilize the SEM in defining mental retardation because it found in *Perkins* that scores "above 70" place a defendant above the cutoff to establish significantly subaverage intellectual functioning. *See* 851 So. 2d at 456. Although the circuit court and the ACCA on appeal quoted and purported to apply *Perkins*, *they never stated that Clemons was not mentally retarded because his IQ was above 70*. Rather, they concluded that the scores that resulted when Clemons put forth effort on IQ tests were *in the range of 70 to 80*, a range that they found inconsistent with a diagnosis of significantly subaverage intellectual functioning.

More importantly, although the circuit court characterized Clemons's IQ score as being in the 70 to 80 range, when a mean score is actually calculated from the few IQ tests Clemons took that the circuit court deemed valid, *i.e.*, the ones in which Clemons did not provide false answers purposefully, Clemons's IQ is at least two points above the "70 to 75 or below" SEM range discussed by the Supreme Court in *Atkins* and by the clinical journals in existence at the time.[7] To understand this, a thorough discussion of the seven IQ tests administered to Clemons throughout his life is warranted. Additionally, five out of the seven mental health professionals who examined Clemons found him to be malingering for psychotic problems and cognitive disabilities, providing reports more detailed than what the circuit court recounted in its order. As such, the facts in the record regarding Clemons's malingering must also be addressed because they severely complicate the process of assessing his intellectual functioning using standardized IQ tests.

To begin, the only record of any test administered to Clemons before the age of 18 was the Stanford-Binet Intelligence Test, which he took when he was six and a half years old. The Stanford-Binet is one of the most widely recognized and utilized intellectual functioning assessment instruments, along with the WAIS

---

[7] Clinical practice indicates that the appropriate method of determining an individual's IQ when there are several tests in the record is to average the scores of the various tests to reach a mean score. *See, e.g., In re Holladay*, 331 F.3d 1169, 1174-75 (11th Cir. 2003).

tests. *See Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010). Clemons scored a full scale IQ of 77 on that instrument, which placed him squarely within the range of borderline intellectual functioning. [*Id.*] There was no evidence presented that Clemons malingered on this test at such a young age.

When Clemons was nineteen years old and in prison in 1991, he was administered the Beta-II intelligence test, and he generated a full scale IQ score of 84 on that instrument, which the circuit court noted was his highest score on any test. [R. EMC_657.] There were no allegations concerning malingering on that test. Although that test was never actually mentioned or submitted into evidence during Clemons's *Atkins* hearing in 2004, it was in the record and discussed at the first Rule 32 hearing in 2001 over which the same judge presided. Clemons argues that several courts have recognized that the Beta-II is not the best tool for measuring an individual's IQ. *See, e.g., Pruitt v. Neal*, 788 F.3d 248, 253 (7th Cir. 2015) (expert noted that Revised Beta (Beta-II) "is not an accurate test, it is not well regarded in the field, and it is not well accepted in the field as a general test of intelligence"; test "severely overestimates" an individual's IQ by "20-30 points"); *Ladd v. Thaler*, 2013 WL 593927, at *2 n.3 (E.D. Tex. Feb. 15, 2013) (state court conclusion that Ladd did not meet intellectual functioning prong of *Atkins* due to 86 Beta test score was rebutted by clear and convincing evidence

because Wechsler score was 67 and Beta test is a less accurate and less reliable IQ test); *Allen v. Wilson*, 2012 WL 2577492, at *4, 10, 15 (S.D. Ind. July 3, 2012) (Beta "antiquated" and not an individualized test but group administered; court finds defendant suffers significantly subaverage intellectual functioning despite 104 score on Beta because Stanford-Binet score of 68 is "most reliable" of IQ tests administered). However, Clemons's argument is misguided because the circuit court was never presented with any substantive argument or evidence as to the Beta-II's reliability during Clemons's Rule 32 proceedings.[8] Accordingly, it was not objectively unreasonable for the circuit court to have taken the score of 84 into account in calculating Clemons's IQ.

The next series of psychological evaluations and IQ testing was conducted prior to Clemons's federal and state trials for the general purpose of determining whether he suffered from any mental illness or cognitive difficulty that would make him incompetent to stand trial. Prior to his federal trial, Clemons submitted to a court-ordered evaluation at the Taylor Hardin Secure Medical Facility in Tuscaloosa. [R. EMC_7201-7214.] Dr. Wilburn H. Rivenbark, a psychologist and certified forensic examiner, evaluated Clemons on August 12, 1992. [R.

---

[8]   Clemons points out that one of the State's experts testified at his trial in 1994 that the Beta-II test is "typically used as a screening" and has a "wider range" of error than the WAIS and Stanford-Binet. [R. EMC_8257-58.] Although the same judge presided over his trial, it is unrealistic to suggest that he should have discredited the results of the Beta-II at Clemons's *Atkins* hearing based on his memory of this isolated statement from ten years prior.

EMC_7202, 7211.] While he did not conduct any IQ tests on Clemons, his interview with him led him to suspect that he was malingering for psychotic problems, due to the fact that Clemons reported "seeing and hearing 'little green friends,'" and several times smiled or laughed out inappropriately apparently without prompting, but stopped the behavior once confronted. [R. EMC_7205-7206, 7210.] Dr. Rivenbark also noted that despite any history of mental illness or treatment, Clemons insisted that he had been suffering from mental illness all his life, but no one believed him. [*Id.*] Dr. Rivenbark concluded that Clemons "was able to understand and appreciate the consequences of his acts at the time of the alleged offenses, and . . . was responsible for his actions." [*Id.*]

Clemons was then subjected to a more thorough psychological evaluation before his federal trial while in prison in Butner, North Carolina. [R. EMC_7240.] On December 10, 1992, Drs. Hazelrigg and Berger administered the Wechsler Adult Intelligence Scale-Revised ("WAISR") to Clemons, and he generated full-scale IQ of 51 on that instrument. [R. EMC_7250.] Drs. Hazelrigg and Berger opined that the results of that test were invalid because Clemons was deliberately malingering for psychotic symptoms and cognitive deficits. As the circuit court noted in its order, in support of their conclusion that he had given false answers purposefully on the WAISR, they noted that it would be nearly impossible for him

to have scored an 84 on the Beta-II one year prior and then score a 51 on the WAISR, and stated that a score of 51 would place Clemons in the category of individuals who are need of structured living and may be institutionalized. [*Id.*] They also made the following observations:

> Mr. Clemons indicated that he was unable to read or write at an adult level. To assess this issue, a writing sample was obtained. Mr. Clemons did not cooperate with providing the sample. He wrote with his left hand (although he is right-handed), printed, and discontinued writing in the middle of a sentence, breaking the pencil. His writing is filled with misspellings, many of which appear contrived and very implausible. For example, he spelled "finger" and "plate" correctly, but misspelled "room" ("rumm") and "girls" ("gurlz"). His handwriting and literacy skills were compared with a written statement he provided in 1991, which was certified as being written by Mr. Clemons in his own handwriting. In this longer sample there is only one trivial misspelling ("droped" instead of "dropped") and it is written in cursive. A comparison of his signature made righthanded (09/16/92) and left handed (12/07/92) shows very little similarity. When asked about this discrepancy, Mr. Clemons acknowledged the two were different, would offer no explanation, but also refused to provide a third sample for comparison.

> . . .

> Mr. Clemons' cognitive ability can be established to be much higher than his presentation during the present evaluation made it appear. Previous IQ scores were of 77 at age six and 84 at age 19 . . . . Although he pretended to be illiterate, his school performance suggests otherwise. Also, he was reported to read the nine page affidavit at the time of his arrest. A written statement from 1991 was certified to be in his handwriting and his wording. Although he reported amnesia for the time of the alleged offenses and stated that he could not recall any of the numerous instances he was informed of the charges against him, his memory for many incidental events during the

evaluation was totally intact and no amnestic episodes or signs of memory deficits were in evidence. Finally, his responses during an evaluation in August 1992 were much more complete that [sic] responses to the same questions in November 1992. For example, in August he knew the colors of the American flag, where the sun rises, and many details about proper courtroom proceedings. In November, he claimed to not know any of this information. There is no known factor that could account for such a dramatic loss of long-term knowledge. Therefore, the diagnosis of Malingering of cognitive deficits is also clearly established.

[*Id.*] They concluded that Clemons's intellectual level is "above the range of retardation" and that Clemons "does not suffer from any mental disorder that would render him unable to understand the nature and consequences of the proceedings against him, or assist his attorney in his own defense."   [R. EMC_7254.]

Prior to his state trial, Clemons was evaluated by two additional professionals who again did not conduct any IQ tests but who agreed with others that Clemons was malingering for psychotic problems and was not mentally retarded. Dr. William H. Grant, a psychiatrist, evaluated Clemons at the request of his counsel on February 3 and 6, 1993, and he cited in support of his conclusion that Clemons malingered for psychotic problems but was in actuality competent to stand trial that he "entered the interview room laughing hysterically and incessantly," but stopped when confronted; that he was able to survive on a violent floor of the jail; and that

he asked him for particular antidepressant drugs by name. [*Id.* at 7216, 7220, 7223-26.] Dr. Grant also noted the following with regard to Clemons's academic record:

> An Alabama basic competency test, from the 9th grade, indicates that the defendant is capable of writing cursive. The title of the defendant's composition is "If I Could Travel Anywhere." The copy I reviewed is barely legible, but appears to read as follows, "If I could travel anywhere, I would never stayed (sic) in one spot. Course, (sic), I'll always be on the run visiting many different places such as New York, Italy, and France and learn how to speak all sourts (sic) of languages. But most of all, I learne (sic) how to be (illegible) in all of those different places plus ect." His grades in 1988 at age seventeen while in the 10th grade, his marks apparently ranged from 10 (in social studies) to 75 (in upholstery). Most are in the sixties and seventies.

[R. EMC_7219-20.] Dr. Grant also noted:

> At the close of the interview Mr. Clemons asked me for Valium. I told him that it was not likely that an abusable street drug like Valium would be prescribed to inmates in jail. I told him that in some custodial facilities Sinequan was available and was popular with inmates (Sinequan is an antidepressant drug with a marked sedating effect). As I recall, the name of the drug was only mentioned once on the first visit and once on the second visit. Subsequently, Mr. Clemons asked jail personnel for Sinequan, by name, on a number of occasions. I'm told he was quite persistent. I mention these events because they are discordant with the Defendant's inability to repeat "The judge runs everything" and "The prosecutor is there to burn me."

[*Id.*]

Finally, Dr. Rivenbark, the psychologist and certified forensic examiner who evaluated Clemons in 1992, attempted a court-ordered evaluation of Clemons on

54

July 26, 1994 at Taylor Hardin. [*Id.* at 7236-7239.] However, he was unable to communicate with Clemons because Clemons refused to speak or make eye contact with him, which Dr. Rivenbark concluded was a deliberate effort on his part and not due to any mental disease. [*Id.* at 7237.] He too opined that Clemons was "deliberately malingering concerning his intellectual ability and his mental state" and that he is competent to stand trial. [*Id.* at 7238-39.]

The next round of IQ testing did not occur until 2000, in preparation for Clemons's first Rule 32 evidentiary hearing in 2001 that dealt in part with his allegations of ineffective assistance of counsel for failure to litigate his alleged mental deficiencies, but before he first raised the claim that he was mentally retarded and thus ineligible for the death penalty pursuant to *Atkins*. In November 2000, Dr. Kimberly Ackerson, a psychologist hired by Clemons's counsel, administered the WAISR to Clemons. Clemons scored a full-scale IQ of 73 on that instrument, and there was no evidence presented that Clemons malingered on that instrument. [R. EMC_815-17.] In fact, as the state court specifically noted, Dr. Ackerson found that Clemons appeared motivated and was deliberate in his responses. Dr. Ackerson also administered an additional intelligence test, the Woodcock-Johnson Revised, on which Clemons tested fairly well regarding his ability to sound out words and identify words (nearly a ninth grade level), but worse

at reading comprehension (a sixth grade level). [R. EMC_818-21.] While Dr. Ackerson was not called to testify at the *Atkins* hearing in 2004, Dr. Golden, Clemons's expert for that hearing, had consulted with her, reviewed all of her material, and testified concerning her findings. [R. EMC_ 814.]

In February 2001, Dr. Glen King, a clinical psychologist hired by the Attorney General's Office to perform a psychological evaluation of Clemons, administered the WAIS-III to Clemons, and Clemons scored a full-scale IQ of 77. [R. EMC_850-51, 853-58, 1505, 1896-1906.] It was Dr. King's opinion that Clemons's full scale IQ of 77 means that he is "borderline intellectual ability," which he said is not the same as mentally retarded. [R. EMC_1505.] Dr. King stated that it was his observation that Clemons "was not trying hard" on the performance IQ section of the test where he scored a 74. [R. EMC_1507.] Dr. Golden, Clemons's expert at the 2004 *Atkins* hearing, testified that because Dr. King made several scoring errors when scoring Clemons's test, Clemons's score should have been a 75. However, the particular items on the test that were questioned by Dr. Golden were discussed at length during the evidentiary hearing in 2004 [R.EMC_ 850-51, 853-58 (Dr. Golden's testimony concerning the three questions), 1507-12 (Dr. King's testimony concerning the three questions), 1896-1906], and the circuit court obviously rejected Dr. Golden's opinion that

Clemons's score should have been a 75, finding as fact that Clemons's score was a 77. During the same evaluation, Dr. King also administered the Minnesota Multiphasic Inventory ("MMPI"), which tests for the presence of psychopathology. [R. EMC_1515.] Dr. King's overall conclusion from Clemons's results on the MMPI was that he was producing false information purposefully and malingering for the presence of a mental illness. [*Id.*] Finally, during that evaluation Dr. King also administered the Wide Range Achievement Test Division Three, which measures academic achievement, and Clemons scored a 98 on the reading part, meaning that he was reading on high school level, and a 96 on the spelling part, meaning that he was spelling at a high school level. [R. EMC_1512-14.]

The last two IQ tests were administered in preparation for Clemons's *Atkins* hearing in 2004. In October 2003, Dr. Golden administered the Stanford-Binet Intelligence Scale, Version 4, on which the circuit court in its order concluded that Clemons scored a 58, thus rejecting Dr. Golden's testimony that the score of 58 should be adjusted upward to a 66 to make it more comparable to Clemons's scores on the WAIS tests. Finally, in February 2004, Dr. King, again retained by the Attorney General's Office, administered an original WAIS to Clemons, in which the court found that Clemons scored a full-scale IQ of 60, and on which Dr. King opined Clemons was malingering in an effort to score lower than he had scored

three years prior when he gave him the WAIS-III. [R. EMC_1527.] As described by the circuit court in its order, Clemons appeared much more indifferent to Dr. King than he had appeared three years prior, and he gave incorrect answers on several of the same questions that he had given better answers to on the previous test. [*Id.* at 1527-30.] Dr. King opined that people whose scores drop so dramatically generally have documented evidence of a stroke, traumatic brain injury, or a brain tumor, none of which he found in Clemons. Dr. King also administered a number of other tests that test for neuropsychological problems and sensory problems, such as the Tactual Performance Test, Trail-Making Part B, the Speech Sounds Perception Test, and the Seashore Rhythm Test, from which he opined that Clemons was malingering. [R. EMC_1541-45, 1548-52.] Finally, he administered a Test of Memory Malingering ("TOMM"), which is a 50-item recognition test that assesses malingering in the adult population. Dr. King testified that Clemons's score of 44 on the second trial indicated malingering for memory difficulties. [R. EMC_1523.] This was the last evaluation in the record.

Based on the foregoing, the Court finds that there was ample evidence in the record supporting the circuit court's decision to discount the results of several IQ tests due to malingering. Malingering is a common threat to the validity of a diagnosis of mental retardation and presents a challenging problem to an *Atkins*

claim. Clinically, malingering is defined as the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives." DSM-IV-TR, American Psychiatric Association, 739-40 (2000). In the *Atkins* context malingering has been described as the "deliberate feigning of mental retardation in order to avoid the death penalty." *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1302 (N.D. Ala. 2009), aff'd, 607 F.3d 749 (11th Cir. 2010). Generally, evidence of malingering on IQ tests is sufficient to discredit those tests for determining a petitioner's intelligence. *See, e.g., Green v. Johnson*, 515 F.3d 290, 300 (4th Cir. 2008) (finding it not an objectively unreasonable application of *Atkins* to discredit a low IQ score after credible evidence has been presented that the petitioner malingered results); *State v. Hill*, 894 N.E.2d 108, 113 (Ohio Ct. App. 2008) (where defendant's results on a malingering test indicated malingering, the associated IQ test was not credible and was due to be ignored); *Ybarra v. State*, 247 P.3d 269, 283 (Nev. 2011) (evidence from the TOMM administered to defendant indicated malingering and could be used to discredit the defendant's low IQ score); *compare with Chase v. State*, 171 So. 3d 463, 481 (Miss. 2015) (where results on a malingering test did not indicate malingering, the associated IQ test was found to be a reliable measure of the defendant's intellectual functioning); *Thomas*, 614 F. Supp. 2d at 1302 (the results of a malingering test that did not indicate malingering

bolstered the court's confidence that the defendant suffered from subaverage intellectual functioning).

Thus, the circuit court reasonably discredited the WAIS-R administered in 1992 by Drs. Hazelrigg and Berger, on which Clemons scored a 51, and the WAIS administered in 2004 by Dr. King, on which he scored a 60. The professionals who administered those tests gave firsthand accounts supporting their conclusions that Clemons was at that time giving false answers purposefully. Dr. King's testimony is particularly useful because he was able to compare Clemons's demeanor and effort in 2001, before *Atkins* made it possible for him to claim mental retardation to avoid the death penalty, with his more indifferent attitude and poor answers in 2004, when he could. Dr. King also administered the TOMM, which indicated malingering. Psychologists developed such tests to measure, in conjunction with IQ tests and other evidence, whether someone is putting forth a satisfactory effort. *See* J. Hom & Robert Denney, Preface: Detection of Response Bias in Forensic Neuropsychology, Part 1, 2 Journal of Forensic Neuropsychology xv (2002). The results of these tests are such useful tools in assessing malingering that some state courts even require that such a test be administered before finding a defendant mentally retarded. *See, e.g., Foster v. State*, 848 So. 2d 172, 175 (Miss. 2003)

(requiring that a test to detect malingering be administered in *Atkins* cases before a court can find a defendant mentally retarded).

Nor does the Court find it objectively unreasonable that the circuit court also considered the opinions from the professionals who examined Clemons in the 1990s, such as Dr. Rivenbark in 1992 and 1994 and Dr. Grant in 1993, even though they did not conduct IQ tests. According to Clemons, clinical practice indicates that malingering and mental retardation are not mutually exclusive: in other words, a petitioner may be manipulative and a malingerer but may also be mentally retarded. This may be true, but the fact remains that the ability to malinger involves a certain level of cunning. Regardless, because malingering is at its heart a question about a person's internal motivations, it appears that any diagnosis would involve considerable clinical judgment by the evaluating medical professional. Drs. Rivenbark and Grant's firsthand accounts are powerful evidence against a finding that Clemons's possesses significantly subaverage intellectual functioning because not only did they find him to be a malingerer but they also rejected any notion that Clemons was mentally retarded.

Finally, the Court finds that it was entirely reasonable for the circuit court to similarly discount the results of the Stanford-Binet administered by Dr. Golden in 2003, on which Clemons scored a 58, even though Dr. Golden did not testify that

Clemons malingered on that test. The circuit court was entitled to take into account Clemons's extensive documented history of malingering in assessing his intellectual functioning, including his widely divergent test scores, and to conclude that because Clemons would have known that he was being tested in preparation for his *Atkins* hearing, he had an incentive to malinger. *See Clemons*, 55 So. 3d at 328 ("The testing revealed that Clemons scored below 70 three times, twice as a part of the latest round of testing when Clemons was presumably aware of the Court of Criminal Appeals' remand on the mental retardation issue.") (quoting circuit court's order). Certainly the legal consequences of a low IQ score in the *Atkins* setting—namely, the potential to reverse a death sentence—serves as a powerful motivation for a defendant to give less than their maximum effort. The Court cannot ignore that Clemons received a 73 and a 77 on tests administered before *Atkins* was decided, but scored nearly 20 points lower just two years later, after he had instituted his *Atkins* proceedings. Although Dr. Golden testified that there was no evidence of malingering on *any* of the four tests administered between 2000 and 2004 [R. EMC_903], the circuit court's order clearly indicates that the court did not find Dr. Golden a credible expert. Indeed, Dr. Golden was the only psychological professional out of seven who ever opined that Clemons was mentally retarded. The circuit court noted that Dr. Golden did not provide clinical

support for his conclusion that the Stanford-Binet he administered in 2003 is a better measure of intelligence for a person who is mentally retarded, nor did he justify or otherwise explain why he increased Clemons's score on that test from a raw score of 58 to a "scaled" score of 66, seemingly to place it more in accord with his scores on the WAIS tests. Additionally, in other parts of the circuit court's order not reproduced by the ACCA on appeal, the court noted that Dr. Golden only testifies on behalf of criminal defendants and never on behalf of prosecutors; that he has testified on behalf of capital petitioners in a post-conviction setting 6-10 times; that he charged $250 per hour and had already incurred fees of approximately $25,000 at the time of Clemons's *Atkins* hearing; that he remained at Clemons's hearing for three additional days after his testimony was completed presumably in an effort to charge more, and that he perhaps revealed some bias as he referred to Clemons as his "client." [R. EMC_683.] Clemons now quarrels with the circuit court's use of these facts to discredit Dr. Golden, but any such argument is irrelevant to this Court's analysis on federal habeas review pursuant to § 2254(d)(2). *See Chester v. Thaler*, 666 F.3d 340, 348 (5th Cir. 2011) ("As factfinder, the trial court is entitled to deference in credibility determinations.") (citing *Thompson v. Keohane*, 516 U.S. 99, 111, 116 S. Ct. 457, 465 (1995)). The circuit court was entitled to make credibility determinations in the first instance, and none of the

aforementioned factual findings could be considered "objectively unreasonable." *See Miller–El*, 537 U.S. at 340, 123 S. Ct. at 1041 (citing the § 2254(d)(2) standard); *see also Wood*, 558 U.S. at 301, 130 S. Ct. at 849 (a federal reviewing court may not characterize state-court factual determinations as unreasonable "merely because [it] would have reached a different conclusion in the first instance"); *Chester*, 666 F.3d at 349 (in finding that § 2254(d)(2) was not met, noting that "Proceedings at the state trial court were a battle between experts with additional testimony and evidence that was inconclusive and invited credibility testing. It is not this court's place to second-guess the court's credibility determinations.").

Malingering aside, when the remaining untainted IQ test scores are averaged to reach a mean score, Clemons does not meet the "70 to 75 or below" SEM range. Specifically, excluding the score of 51 on the WAIS-R while in federal prison in 1992, the 58 on the Stanford-Binet that Dr. Golden administered in February 2003, and the 60 on the WAIS administered by Dr. King in February 2004, there was no evidence presented that Clemons malingered when he generated scores on the Stanford-Binet he took at age six and a half, on which he scored a 77; on the Beta-II that he took while in prison in 1991, on which he scored an 84; on the WAIS-R that Dr. Ackerson administered to Clemons in November 2000, on which he scored a 73; and on the WAIS-III that Dr. King administered in February 2001, on which he

scored a 77. The mean of these untainted scores is 77.75 (77 + 84 + 73 + 77 divided by 4). Not only that, but Clemons scored in the ninety-eight and ninety-six percentiles on an achievement test administered in 2001, indicating that he was reading and spelling at a high school level.

In *In re Henry*, 757 F.3d 1151, 1162 (11th Cir. 2014), the Eleventh Circuit held that a habeas petitioner's score of 78 on the WAIS was insufficient to meet the first prong of an *Atkins* claim raised on the eve of his execution. By the time *Henry* was decided, the Supreme Court had recently held unconstitutional a Florida statute imposing a fixed cutoff score of 70 without considering the five point SEM required by the clinical definitions discussed in *Atkins*. *See Hall v. Florida*, 134 S. Ct. 1986 (2014). Still, the Eleventh Circuit noted in *Henry*:

> The rule announced in *Hall*, however, affords Henry no relief in this case. In *Hall*, as we've noted, the Supreme Court concluded that because of a +/- 5 standard of error, "an individual with an IQ test score 'between 70 and 75 or lower' . . . may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Hall*, 134 S. Ct. at 2000 (quoting *Atkins*, 536 U.S. at 309 n. 5, 122 S. Ct. 2242). The dissent elides around this holding in *Hall*, and suggests that no matter the IQ score—be it 75, 78, or presumably even 88—a defendant should still be allowed to present evidence about the deficiencies in his adaptive functioning in order to make a claim of intellectual disability. But this is not what *Hall* says. *Hall* squarely holds that it is "the Court's independent assessment that an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." 134 S. Ct. at 2000; *see* American Psychiatric Association, Diagnostic and Statistical Manual of Mental

Disorders (DSM–5) 37 (5th ed. 2013) ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65–75 (70 ± 5)"). The Supreme Court never said that a petitioner who could only establish an IQ score of, say, 78 would be entitled anyway to make up the difference with other evidence of deficiencies. *See* 134 S. Ct. at 1996 ("Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater . . . and so they are not included alongside Florida in this analysis."). The problem petitioner has under *Hall* is he can point to no IQ test yielding a score of 75 or below. Thus, building in the standard error approach explicated by the Supreme Court in *Hall* would not entitle Henry to the additional "opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning." *Hall*, 134 S. Ct. at 2001. The Supreme Court in *Hall* did not hold that a petitioner like Henry, who only has IQ test scores above 75 (here an IQ score of 78), must have an additional chance to demonstrate intellectual disability by pointing to deficiencies in adaptive skills. At the end of the day, taking into account the standard error of measurement explicated by *Hall* does not entitle Henry to the opportunity to present additional evidence of an intellectual disability.

757 F.3d at 1162-63. Similar to *Henry*, even building in the standard error approach, Clemons's mean IQ score is not 75 or below. Granted, Clemons does have one valid IQ score within the "70 to 75 or below" SEM range: the 73 on the WAIS-R administered by Dr. Ackerson in 2000. That score could support a finding of subaverage intellectual functioning, but it could also sustain a finding that Clemons is not retarded. One score that perhaps cuts both ways, however, does not entitle Clemons to a finding by this Court that the circuit court's factual findings were

objectively unreasonable. *See Miller–El*, 537 U.S. at 340, 123 S. Ct. at 1041; *Wood*, 558 U.S. at 301, 130 S. Ct. at 849.

In this way, this case is distinguishable from *Smith v. Campbell*, 620 F. App'x 734, 750 (11th Cir. 2015) (unpublished), in which the Eleventh Circuit held that the state court's factual determination that the petitioner there was not mentally retarded was unreasonable under § 2254(d)(2) and warranted relief. Petitioner Smith had received an IQ score of 72 as an adult and did arithmetic at a kindergarten level. *Id.* at 738. The Eleventh Circuit rejected the state court's determination that Smith did not offer adequate proof of significantly subaverage intellectual functioning, stating, "[T]he problem for the State here is that the trial evidence showed that Smith's IQ score could be as low as 69 given a standard error of measurement of plus-or-minus three points." *Id.* at 749-50. Not only is Clemons's average score higher, but *Smith* is also distinguishable because Smith was never afforded an evidentiary hearing on the *Atkins* claim that he raised in his second amended Rule 32 petition, and the Alabama courts instead relied solely on the trial evidence and the factual allegations that Smith raised in his petition in denying relief on his *Atkins* claim. In Clemons's case, he was afforded a four-day evidentiary hearing on the claim that he was mentally retarded and thus the circuit court had the benefit of a fully developed record. Nor does *Brumfield v. Cain*, 135 S.

Ct. 2269 (2015), control the outcome here. In that case, the Supreme Court recently found that a petitioner's IQ score of 75 "was entirely consistent with intellectual disability" when "[a]ccounting for th[e] margin of error." *Id.* at 2277-78. Not only does Clemons have a higher mean score than Smith or Brumfield, but there was no evidence of malingering present in either of those cases. The fact that the record is replete with instances of Clemons's malingering on IQ tests and in the context of other interviews with mental health professionals makes it virtually impossible to compare this case with other *Atkins* cases where malingering was not an issue.

The record supports the circuit court's factual finding that since Clemons did not meet *Atkins*'s first prong, he is not mentally retarded. However, this Court will also consider whether the circuit court's determination that Clemons did not suffer significant deficits in adaptive functioning was unreasonable.[9]

---

[9]    At this point the Court takes a moment to note that Clemons makes several other claims in support of his argument that the state courts made unreasonable factual determinations. For one thing, he argues that the circuit court's conclusion that his IQ scores did not place him in the range of decreased intellectual functioning was unreasonable because it did not take into account the "Flynn effect," which is the name given to the recognition that IQ scores have been increasing from one generation to the next because as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that instrument increases. According to Clemons, when one applies the Flynn effect to his mean score, it is well under 70. However, while Clemons discusses other opinions, some from the Eleventh Circuit, stating that the Flynn effect is an empirically proven statistical fact, there was no evidence presented to the state courts regarding this phenomenon. It would be improper for this Court to find that the state courts' findings were somehow unreasonable by relying on an issue that was never presented to them. Secondly, Clemons points, in passing, to evidence before

### 2.     Significant Limitations in Adaptive Functioning

Per *Atkins*, the second prong of the mental retardation test is satisfied when the petitioner demonstrates "significant limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3; 122 S. Ct. at 2245 n.3 (referencing the AAMR and the American Psychiatric Association's definitions).

In determining that Clemons does not meet the adaptive functioning element of mental retardation, the circuit court, relying on the Alabama cases of *Perkins*, 851 So. 2d at 456, *Smith*, 2003 WL 1145475, and *Stallworth*, 868 So. 2d at 1182, cited the following factors as evidence of whether a criminal is mentally retarded: "employment history, the ability to have interpersonal relationships, being extensively involved in criminal activity, post-crime craftiness on the part of the criminal, and being able to use community resources." *Clemons*, 55 So. 3d at 329. The circuit court found that the application of these factors to Clemons counseled against a finding that he had any deficits in adaptive functioning for numerous

---

the state courts that he argues shows he suffers from frontal lobe dysfunction and impaired brain function. While he apparently offers this evidence in support of his claim that he is mentally retarded, the circuit court rejected such evidence as inadmissible at his *Atkins* hearing, and the ACCA affirmed that ruling. Perhaps for that reason Clemons devotes little to no discussion to why such evidence supports his claim. Any such claim is rejected.

reasons. Clemons was employed in several low skill jobs, each lasting a few months, including a job as a delivery driver for Dominos pizza. He had a drivers license, and his employer at Dominos testified that if he was familiar with the neighborhood he had no trouble delivering pizzas. He had relationships with women and fathered at least two children. The court rejected any notion that Clemons's lack of employment history was due to inferior adaptive functioning, relying instead on Drs. Berger and Hazelrigg's report that he was not motivated but spent his time engaging in illegal behavior, substance abuse, and promiscuous sexual activity rather than seeking work. He acted with premeditation by obtaining a gun the week before he carried out the carjacking. Further, a codefendent testified that he told him which gas station to drive into to commit the carjacking, and that after the murder Clemons instructed him not to talk because he had "just killed a DEA man." Clemons exhibited post-crime craftiness by telling police after the murder that he was pressured into committing the carjacking by his friends and that he acted in self-defense. He was extensively involved in criminal activity because he had single-handedly carjacked cars on three separate occasions at gunpoint prior to the murder of DEA Agent Althouse. The fact that he travelled on a Greyhound Bus to Cleveland after the murder showed that he could use the community resources

of transportation. The circuit court also relied on Dr. King's testimony regarding

Clemons's adaptive functioning:

> In addition, by history, Mr. Clemons had a driver's license, he worked some places for a year at a time. He was able to matriculate through school to the tenth grade, even if he stopped at that point. He has literacy levels that seem to vary by whoever is giving him the test and under what circumstances, but clearly with me he was able to recognize words and spell words, rather sophisticated words, at about a high school level with ninety-eight, ninety-six scores.
>
> So those adaptive functions along with assessed IQ scores indicate to me he is certainly not mentally retarded and probably functions in the high borderline to low average range of ability.

[R. PDF Vol. 8 at 836.] Finally, the court relied on Dr. Grant's testimony that

Clemons was a hardened criminal, whose ability to survive among violent inmates

at the Jefferson County Jail may attest to his true ability to function.

Clemons argues that the circuit court unreasonably determined that he was

not mentally retarded because it improperly assessed his adaptive functioning

based on his strengths rather than his weaknesses. Clemons contends that it was

unreasonable for the circuit court to do so because the DSM-IV-TR manual in

effect at the time of his *Atkins* hearing cautions that "[t]he diagnostic criteria for

Mental Retardation do not include an exclusion criterion;" DSM-IV-TR at 47

(emphasis added), which Clemons argues means that the presence of one or more

strengths does not exclude a subject from a mental retardation diagnosis.

71

Clemons's argument fails for two reasons. First, nothing in *Atkins* or the Alabama Supreme Court cases developing the standard for assessing mental retardation at the time of his hearing instructed that courts could *not* consider a petitioner's abilities in assessing their adaptive functioning. Thus, the Court rejects the notion that the aforementioned instruction in the DSM-IV-TR was enough to have put the circuit court on notice that it could only assess Clemons's weaknesses to the exclusion of any strengths. Although it was undisputed that Clemons needed to have established deficits in only two areas of adaptive functioning, certainly neither expert at the hearing testified that the court was *prohibited* from considering Clemons's abilities in making the determination.

Second, the circuit court's order implies that it rejected the testimony of Dr. Golden, who was the only expert in the record who testified that Clemons suffered any deficits in adaptive functioning, and the court's credibility determination will not be overturned on federal habeas review. *See Chester*, 666 F.3d at 348. As Clemons points out, Dr. Golden testified at his hearing that Clemons had deficits in six out of ten areas of adaptive functioning. In support of his testimony, he cited to the results of a test that he administered to Clemons in 2003, the Adaptive Behavior Assessment System test ("ABAS-II"). The ABAS-II assesses functioning in ten areas—Communication, Community Use, Functional Academics, Health

and Safety, Home or School Living, Leisure, Self-Care, Self-Direction, Social, and Work—from which four domain composite scores (Conceptual, Social, Practical, and General Adaptive Composite) are calculated. Dr. Golden described the test at Clemons's *Atkins* hearing as "the best normed and current available test for looking at adaptive system[s]. One that was derived specifically from the criteria from DSM-IV and the AAMR." [R. EMC_917.] The ABAS-II is designed so that a score of ten in each adaptive area is considered average, and any score of four or below is considered impaired. According to Dr. Golden, Clemons's scores were average in communication and use of community resources. He scored a five in functional academics, indicating that he was impaired but not impaired enough to show a significant deficit. Dr. Golden found that Clemons scored a one in self-direction skills, a one in social skills, a one in work skills, a two in home living skills, a three in health and safety skills, and a four in leisure activities. [R. EMC_918-19.] The only individuals Dr. Golden spoke to in order to allow him to score the test were Clemons's grandmother, with whom he had lived off and on up until the age of eighteen, as well as Clemons's former employer at Dominos pizza, Mr. Pritchard. [R. EMC_919.] The ABAS-II test that Dr. Golden administered is a nine-page questionnaire that asks the parent of a child aged 5 to 21 to fill out various questions regarding the child's abilities. [R. PDF Vol. 11 at 317-328.] For

each question asked, the parent may circle a zero indicating that the child "is not able," a one indicating that the child does a particular action "never when needed," a two indicating that the child does a particular action "sometimes when needed," a three indicating that the child does a particular action "always when needed," or a box indicating that the parent guessed on the answer. For example, under the heading "Home Living," there were twelve questions for the parent to rank the child's ability on, such as whether the child "wipes up spills at home," "clears the table completely after a meal," or "uses a clothes dryer." [R. PDF Vol. 11 at 321-22.] Someone, presumably Dr. Golden after speaking with Clemons's grandmother, gave Clemons a "2" for wiping up spills at home, a "2" for clearing the table completely after a meal, and a "2" for uses the clothes dryer, all indicating that Clemons does those things "sometimes when needed." [*Id.*] At Clemons's hearing, Dr. Golden did not provide examples or offer anecdotes as to why certain scores were calculated in any of these fields, or otherwise explain in any further detail the test or the test results. On cross examination, Dr. Golden admitted that Clemons exhibited goal-directed behavior when he obtained a gun and held up a man to get a car that he wanted. [R. PDF Vol. 5 at 268.]

Although the circuit court's order did not mention the results of the ABAS-II administered by Dr. Golden, its silence as to that test, taken along with its choice

74

to credit Dr. King's, Dr. Berger's, Dr. Hazelrigg's, and Dr. Grant's opinions instead and the other enumerated ways in which it discredited Dr. Golden as an expert, discussed *supra*, indicate that the circuit court did not find Dr. Golden's conclusions on the ABAS-II as evidence that was pertinent to Clemons's capabilities with regard to the adaptive functioning prong, and instead found that Clemons had not demonstrated deficits in any areas. Indeed, the aforementioned facts cited by the circuit court highlight the deficiency of Clemons's claim that the state court's factual findings were unreasonable. In short, Clemons's actions before and after the murder were not the work of a person with diminished intellectual capacity. Indeed, *Atkins* explains:

> [C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. *There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.*

536 U.S. at 318, 122 S. Ct. at 2250 (emphasis added). The record before the circuit court is clear that Clemons did not act on an impulse, but rather "pursu[ed] a

premeditated plan," acting of his own volition rather than as a "follower[ ]." *Id.* Nothing about this crime suggests Clemons had difficulties "process[ing] information" or "engag[ing] in logical reasoning." *Id.*

This Court will not second-guess the circuit court's credibility determination with regard to Dr. Golden's testimony that Clemons suffered deficits. Even if one could say that the evidence as to this prong of the *Atkins* analysis cuts both ways, given the conflicted nature of the evidence, Clemons cannot overcome the state court's findings on a review pursuant to §2254(d)(2). The Court concludes that the circuit court's factual determination that Clemons did not demonstrate significant limitations in adaptive functioning was not unreasonable.

### 3.   Originating Before the Age of 18

The third criterion for establishing mental retardation under accepted clinical definitions is that the functional limitations develop before the subject is 18 years of age. The circuit court found that Clemons also failed to meet this prong because he scored a full-scale IQ of 77 on the Stanford-Binet administered when he was six-and-a-half-years-old and did not demonstrate significant deficits in adaptive functioning before age 18. Clemons contends this finding was unreasonable because Dr. Golden testified that a score of 77 obtained when the subject was six years old is

not reliable for diagnostic purposes because IQ does not stabilize until a child reaches the age of ten to twelve. [R. EMC_923.] However, Dr. King disagreed, opining that scores stabilize at "six to eight" years of age. [R. EMC_1618-19.] As noted previously, the circuit court's order indicates that it found Dr. King to be a more credible expert than Dr. Golden, which was entirely within its purview.

Clemons presents the following evidence in support of his claim that the court's factual determination was unreasonable: a physician and school psychologist diagnosed him as "educable mentally retarded" when he was six years old [R. EMC_1698-1722]; he was held back in school twice, starting third grade when he should have been in fifth [R. EMC_791]; he earned many Ds and Fs [R. EMC_791-800, 1723-38]; and he eventually dropped out of school at age 18 [R. EMC_1752-56]. In contrast to this evidence of poor school performance, however, his IQ score of 77 at age six and a half during the developmental period, when there was no incentive for Clemons to malinger, is powerful objective evidence of his true intellectual ability. Additionally, this score is consistent with his scores later in life that were untainted by malingering allegations, such as the 77 he received in 2001 on the WAIS administered by Dr. King before he was aware that he could bring a claim for mental retardation in light of *Atkins*. In *Hines v. Thaler,* 456 F. App'x 357 (5th Cir. 2011) (unpublished) (denying application for a certificate of appealability),

the court was presented with the petitioner's full-scale IQ score of 96 on a test administered when he was thirteen and a score of 69 on the WAIS-III when he was 31 years old and incarcerated. *Id.* at 368. The Fifth Circuit affirmed the district court's ruling that it was entirely reasonable for the state court to give more weight to the IQ test taken during the petitioner's childhood over "those conducted in the shadow of habeas litigation." *Id.* at 369. Thus, the court found that it was not an unreasonable determination of *Atkins* for the state court to sustain a finding that the petitioner had not proved he had subaverage intellectual functioning. *Id.* at 369-70. Nor can Clemons overcome the circuit court's finding that deficits in adaptive functioning before the age of 18 had not been proven. Dr. Golden was the only psychological professional who said that he suffered deficits before the age of 18, and he based this conclusion on the results of the ABAS-II, which is not without problems. [R. EMC_921.]

In sum, Clemons presented a thin case of mental retardation. His penchant for malingering impeded the court's ability to determine whether he suffers from significantly subaverage intellectual functioning, and the average of the untainted IQ scores was above the "70 to 75 or below" cutoff, even considering the SEM. As to the second and third prongs of his *Atkins* claim, the evidence relied upon by the circuit court strongly suggested that Clemons did not fit that criteria, and any

evidence that cut the other way was appropriately discredited by the finder of fact in the first instance. Of course, Clemons's burden here is higher than simply convincing this Court that he is mentally retarded under *Atkins*. He must show that the state court's determination was unreasonable; he falls short of this burden.

### C.     Whether Clemons has Established that § 2254(d)(1) Applies

Clemons also contends that the state courts violated clearly established Federal law when they 1) relied on *Perkins* to apply a fixed IQ cutoff score of 70 or below as a prerequisite to a finding that a petitioner has established subaverage intellectual functioning, and 2) relied on evidence of Clemons's strengths to the exclusion of any weaknesses in finding that he did not suffer deficits in adaptive functioning because *Atkins* required courts to "generally conform" to the accepted clinical definitions of mental retardation. 536 U.S. at 317 n.22, 122 S. Ct. at 2250 n.22.

This argument deserves little analysis. The Supreme Court unequivocally left to the States the task of developing their own standards for determining mental retardation. *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250. Alabama's standard, as announced in *Perkins*, thus governed Clemons's *Atkins* claim in 2004. *See, e.g., Burgess v. Comm'r, Ala. Dept. of Corrs.*, 723 F.3d 1308, 1321 (11th Cir. 2013) ("it is Alabama's standard, announced in *Ex parte Perkins*, which governs Burgess's

*Atkins* claim . . .); *Smith*, 620 F. App'x at 747-48. Thus, it was not error for the circuit court to apply *Perkins.* In any event, as already discussed, in reaching its factual determination that Clemons is not mentally retarded, the circuit court applied not only the Alabama standard announced in *Perkins* but also the AAMR and American Psychiatric Association's clinical definitions espoused in *Atkins*, including their recognition of the SEM. Nor was it a violation of *Atkins* for the circuit court to have discussed the overwhelming evidence of Clemons's strengths in various areas of adaptive functioning, merely because the DSM-IV-TR may have indicated that "exclusion criteria" should not be applied. *But see Atkins*, 536 U.S. at 318, 122 S. Ct. at 2250 (discussing that mentally retarded individuals are often followers rather than leaders and act on impulse rather than pursue a premeditated plan, attributes at odds with Clemons's behavior).

Clemons relies heavily on *Hall* to make the point that in the years since *Atkins*, the Supreme Court reaffirmed that *Atkins* requires state definitions of mental retardation to "generally conform to the clinical definitions." *See Hall*, 134 S. Ct. at 1999. In *Hall,* the Court explained that while *Atkins* left states free to "develop[] ways to enforce" the constitutional protection, that is, to create procedures for determining mental retardation, "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection." *Id.*

at 1998. However, even if this Court were writing on a clean slate, it is not immediately obvious that *Hall*, even with its explicit recognition of the five point SEM, would direct a finding of mental retardation under these facts. In any event, this Court must consider Clemons's claim through the AEDPA's discriminating lens, and of course, the Alabama courts could not have violated clearly established Federal law that was not in existence in 2004. *See Lockyer*, 538 U.S. at 71, 123 S. Ct. at 1172.

## VI.   EVIDENTIARY HEARING

Clemons moved for an evidentiary hearing in the event the Court denied his petition for habeas relief based on the state court record alone. (Doc. 54.) That motion is hereby DENIED. Rule 8(a) of the Habeas Rules states that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rules Governing § 2254 Cases, Rule 8(a), 28 U.S.C. § 2254. Because the Court finds Clemons's habeas petition is due to be dismissed, the court also finds Clemons's request for an evidentiary hearing is due to be denied.

## VII.   CONCLUSION

For all of the reasons set forth herein, Clemons's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336, 123 S. Ct. at 1039 (internal quotations omitted). This Court finds Clemons's claim does not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** AND **ORDERED** ON MARCH 28, 2016.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704

82